[No. S042659. May 17, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH LLOYD COOK, Defendant and Appellant.

1336

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Robin Kallman, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Gary W. Schons, Assistant Attorneys General, William M. Wood and Arlene Aquintey Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—Defendant Joseph Lloyd Cook appeals from a judgment of the San Bernardino County Superior Court imposing the death penalty following his conviction of two counts of first degree murder (Pen. Code, § 187),[1] one count of burglary (§ 459), and two counts of robbery (§ 211), accompanied by special circumstance findings that he committed multiple murders (§ 190.2, subd. (a)(3)), and murders while engaged in the commission of robbery (*id.*, subd. (a)(17)). The jury also found defendant personally used a deadly and dangerous weapon (§§ 12022, subd. (b), 1192.7, subd. (c)(23)) during the murders and the robberies. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

On July 9, 1992, Hubert and Pearl Hails, ages 82 and 81 respectively, were murdered in their Joshua Tree home. Friend Ruth Eyer had visited the couple around 4:00 p.m. on that day, and the Hailses introduced defendant to her while he was working in their yard. Later that day, at dusk, the Hailses' son Robert came to visit. He noticed the lights were out and the Hailses' white Toyota pickup truck was gone. Robert assumed the couple had driven off to celebrate their wedding anniversary.

Between 5:30 and 7:00 p.m. that same day, defendant arrived at the La Quinta home of his brother, Jeff Cook. Defendant was driving the Hailses' white pickup truck. Inside the truck were the Hailses' large stereo speakers, which defendant sold to his brother for $150. A few days later, on July 11, Robert Hails returned to his parents' home and found their bodies. He noticed that two stereo speakers were missing, as well as a jewelry box, his mother's purse, the keys to the Hailses' truck, and a notebook in which his father recorded the name of each person who worked at the Joshua Tree home, the number of hours worked, and the amount of pay.

Investigating officers found on the Hailses' living room floor a crumpled ledger sheet from the missing notebook that contained defendant's work record, showing he started working at 3:30 p.m. on July 9, but lacking any notation as to stop time, hours worked, amount of pay, or signature. The officers also found latent palm prints on the Hailses' truck that matched defendant's palm, and similar matching prints were found on the crumpled ledger sheet.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

A parole search of defendant's home disclosed a letter signed by defendant and addressed to his landlord which stated that defendant was working for the Hailses and that his recent financial problems had been resolved. The search also disclosed a discarded pair of tennis shoes in a trash bag in defendant's garage. The shoes bore blood spatters consistent with Pearl Hails's blood, but not with Hubert Hails's or defendant's. (An expert testified that only about 1.7 percent of the general population of San Bernardino County, including Pearl Hails, would have an enzyme pattern consistent with that found on the right shoe and that about 9.8 percent of the same population, including Pearl Hails, would have an enzyme pattern consistent with that found on the left shoe.) Blood traces found on defendant's patio were consistent with Hubert's blood, but not with Pearl's or defendant's.

Witnesses Gina and Cruz Wilcox identified defendant as the man they saw standing next to a white pickup truck in front of their house on July 10, 1992; the truck was parked about a half-mile from defendant's residence.

After conducting autopsies, a pathologist concluded that Hubert had suffered numerous internal and external injuries, including one likely fatal blow to the forehead that a blunt object such as a hammer had caused. Pearl too had been fatally struck on the head, extremities, and torso by a blunt object, leaving wounds similar to those inflicted on Hubert.

The defense introduced expert testimony disputing the prosecution's theory that the Hailses died as early as July 9 and attempting to cast doubt on certain witnesses' identifications of defendant.

At the penalty phase, the prosecution introduced evidence of defendant's prior burglary conviction. The defense called several witnesses. Defendant's mother testified that her husband physically abused her while she was pregnant with defendant. She said her husband later was physically abusive to defendant, starting as early as when defendant was a few weeks old, and that her husband shook defendant very hard and threw him into his bassinet. Defendant's mother added that, as a child, defendant had speech problems, wet his bed, was hyperactive, and was "slow to learn." Defendant's sister Janet testified that their mother beat defendant and her other six children on a daily basis and that she and another sister were placed in foster care because their father had molested them. An educational psychologist testified that her tests showed that defendant is mildly learning disabled. A doctor who recorded the electrical activity of defendant's brain testified that he discovered a dominant abnormality of the left side of defendant's brain that could

have been caused by shaking. A clinical psychologist testified that trauma defendant received as a baby could have caused defendant's brain damage. The psychologist said his tests revealed a pronounced split between defendant's verbal and nonverbal intelligence.

## II. GUILT PHASE ISSUES

### A. *Error in Excusing Prospective Juror Maria R.*

Defendant first argues the court erred in excusing for cause Prospective Juror Maria R. because of her stated aversion to the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844].) He claims excluding Maria R. as a potential juror deprived him of his right to be tried by a fair and impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) Defendant also claims the exclusion violated his rights to due process and a reliable penalty determination. (U.S. Const., 5th, 8th & 14th Amends.)

The record shows that, to evaluate prospective jurors' ability to serve in the case, the court required them to complete a questionnaire that asked their views regarding the death penalty. Maria R. answered that she did "not believe" in the death penalty and "could never vote for the death penalty even if someone were convicted of murder with special circumstances." She also answered "yes," however, to a question asking whether she could set aside her feelings against the death penalty when the court instructed her to do so.

Both the prosecution and defense moved to exclude for cause various prospective jurors solely on the basis of their questionnaire responses. Maria R. was among those whom the prosecutor challenged for cause. The defense observed that Maria R. indicated she could set aside her feelings about the death penalty. The court, without conducting voir dire of Maria R., nonetheless excused her, observing that, not only did she express strong views against the death penalty, but she also admitted that victim photographs would strongly affect and anger her, and that she would automatically accept the opinions of various professional medical experts.

Defendant now argues that the court erred in failing to conduct voir dire to clarify Maria R.'s views. The Attorney General responds that defendant waived the point by agreeing with the prosecutor that the court could resolve challenges for cause on the basis of the questionnaire responses alone. We first address the claim of waiver or forfeiture.

The record shows that the court asked whether, in addition to prospective jurors both parties agreed should be excused, "are there others that there's going to be a challenge for cause that you're willing to submit on the questionnaires?" Defense Counsel Goldstein acknowledged that he had agreed with the prosecutor to "submit on the questionnaire" challenges for cause to certain prospective jurors, and the court clarified that, although the parties could discuss these challenges with the court in chambers, they would be "thereby waiving your right to any further questioning . . . ." The court also noted that if it *denied* any such challenges, counsel could later question the prospective jurors in voir dire if their names were called. Both defense counsel and prosecutor expressly agreed to this procedure.

After the defense's challenges were discussed in chambers and were either granted, denied, withdrawn, or submitted on the questionnaires, the prosecutor's challenges were similarly discussed, including the challenge to Maria R. (also referred to as Juror No. 116). Defense counsel, after simply noting that Maria R. had indicated in her questionnaire that she could set aside her beliefs against the death penalty, agreed to "submit it" without requesting further voir dire. The court then asked defense counsel, "On this one specifically, you're agreeing to submit it at this point on the questionnaire without any additional clarifying questions?" Defense counsel replied, "yes." The court then discussed Maria R.'s questionnaire responses and indicated that it would grant the challenge for cause for the reasons stated above. Defense counsel made no comment.

Therefore, we agree with the Attorney General that defendant has forfeited his right to complain of the court's failure to interrogate Maria R. further on voir dire. Defense counsel repeatedly agreed to let the court decide the challenge solely on the basis of the questionnaire responses. In that regard, the present case is distinguishable from *People v. Stewart* (2004) 33 Cal.4th 425 [15 Cal.Rptr.3d 656, 93 P.3d 271], on which defendant relies. There, we reversed a penalty judgment because the trial court, *acting without the parties' prior agreement*, granted several prosecution challenges for cause solely on the basis of the questionnaire responses, despite the court's earlier assurances that it would conduct further oral voir dire to address any ambiguous responses, and despite the defendant's repeated objections to the procedure the court used. (*Id.* at p. 452.)

■ Here, perhaps in the interest of accelerating the normally slow jury selection process, both parties, through their counsel, agreed to submit challenges for cause on the basis of the questionnaire responses, following argument in chambers. Although this procedure may sometimes result in the exclusion of prospective jurors whose ambiguous responses might be clarified on voir dire, we see no legal impediment to such procedure. Capital

defendants are permitted to waive "the most crucial of rights," including the rights to counsel, to a jury trial, to offer a guilt phase defense, and to be present at various stages of trial. (E.g., *People v. Robertson* (1989) 48 Cal.3d 18, 61 [255 Cal.Rptr. 631, 767 P.2d 1109], and cases cited.) And counsel, as "captain of the ship," maintains complete control of defense tactics and strategies, except that the defendant retains a few "fundamental" personal rights. (E.g., *In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335].)

In order to address the merits of defendant's contention, we have reviewed the record de novo to determine whether the trial court had sufficient information regarding Maria R.'s state of mind to permit it to reliably determine whether her views would prevent or substantially impair the performance of her duties in this case. (*People v. Stewart, supra,* 33 Cal.4th at p. 445.) In *People v. Avila* (2006) 38 Cal.4th 491, 532 [43 Cal.Rptr.3d 1, 133 P.3d 1076], we upheld a trial court order excusing Prospective Juror O.D., whose questionnaire answers showed he could never impose the death penalty even though he also responded that he could set aside his personal feelings and follow the law. The questionnaire before us presents a similar dichotomy.

In her questionnaire, Maria R. answered that she did "not believe" in the death penalty, that she felt the death penalty was imposed "randomly," that she generally would "strongly recommend" a sentence of life imprisonment without parole, and that she "could never vote for the death penalty even if someone were convicted of murder with special circumstances." Significantly, with regard to question No. 48 of the jury questionnaire, Maria R. unequivocally answered "no" to the following question: "It is alleged that two deaths occurred in a *single incident.* Depending upon all of the circumstances of this case and the evidence to be presented in the penalty phase, if any, could you consider as a realistic and practical possibility . . . [i]mposing the death penalty in such a case[?]" (Capitalization and emphasis omitted.) Maria R. answered "yes," however, to a question asking whether she could set aside her feelings against the death penalty when the court instructed her to do so and follow the court's instructions.

Although Maria R. stated that, in the abstract, she could put her feelings about the death penalty aside and follow the court's instructions, she repeatedly expressed her unequivocal opposition to the death penalty and specifically stated her unequivocal refusal to consider the possibility of imposing the death penalty in a case in which two deaths occurred in a single incident.

Her answer to question No. 48 revealed that, regardless what the evidence would show at trial or at the penalty phase and regardless what instructions she would receive, Maria R. could not consider the possibility of imposing the death penalty in the instant case. Having reviewed all relevant responses in Maria R.'s questionnaire, we find that, when taken together, her views, as expressed in her answers to the jury questionnaire, would have prevented or substantially impaired her from performing her duties in this particular case. (*People v. Stewart, supra,* 33 Cal.4th at p. 445.) Accordingly, the trial court did not err by excusing Maria R. for cause based on her responses to the jury questionnaire.

### B. *Error in Admitting Results of Electrophoretic Testing*

██  At the preliminary hearing, and again at trial, the defense moved to exclude the testimony of crime laboratory (lab) criminalist John Johnson, who testified regarding his extensive qualifications and expertise in the electrophoretic method of blood testing. Here, defendant contends the trial court erred in admitting the results of the electrophoretic testing of the stains on the tennis shoes found in his garage. Specifically, he claims the prosecutor failed to satisfy the three prongs of *People v. Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*), for the admissibility of scientific evidence, namely, (1) the relevant scientific community's general acceptance of the technique or testing procedure, (2) an expert properly qualified to testify regarding such reliability, and (3) use of correct scientific procedures in the case before us. Defendant contends the erroneous admission of the results of the electrophoretic testing violated state evidentiary provisions (Evid. Code, §§ 350, 352), as well as his state and federal constitutional rights to due process and to a fair and reliable capital trial. (U.S. Const., 8th & 14th Amends.; Cal. Const., art I, §§ 7, 15, & 17.)

In July 1992, Johnson analyzed the stains on the tennis shoes. The left shoe bore a single bloodstain, while the right shoe had blood spattered on top and on its lace. Johnson's tests led him to conclude that all these stains could have been Pearl's blood, but not Hubert's or defendant's. At trial, Johnson testified that about 1.7 percent of the general population of San Bernardino County (including Pearl) would have an enzyme pattern consistent with that found on the right shoe, and that 9.8 percent of the population (and Pearl) would have a pattern consistent with the stain on the left shoe.

Johnson explained that, in order to test the stains on the right shoe, he combined some of the scattered stains on it. He did so because each stain was an extremely limited sample and because the stains were close together, which indicated that they came from a single source. His testing disclosed that the combined stains did come from a single source, and he noted that his

testing would have revealed the existence of separate sources had that been the case. Johnson left enough stains on the right shoe to allow further analysis if needed. Johnson also explained that, after testing the right shoe stains and combinations of stains, he compiled the results into a single blood profile, treating them as coming from the same single source.

We discuss the three prongs of *Kelly* below.

*1. General acceptance—Kelly's* first prong requires proof that the scientific technique is a generally accepted procedure in the relevant scientific community. Although defendant acknowledges that electrophoretic testing of dried bloodstains is generally accepted (see, e.g., *People v. Fierro* (1991) 1 Cal.4th 173, 215 [3 Cal.Rptr.2d 426, 821 P.2d 1302]), he argues that the particular methodology used here with regard to the right shoe, namely, treating the scattered right shoe stains as coming from a single source, and combining the results of several different tests of those stains into a single blood profile, was a novel procedure unsupported by proof of general scientific acceptance.

■ Johnson's assumption, that the blood spatters on the right shoe came from a single source, seems little more than application of common sense. (See *People v. Clark* (1993) 5 Cal.4th 950, 1017–1018 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [blood spatter testimony not subject to *Kelly, supra,* 17 Cal.3d 24, rule because analytical methods used produce no " 'aura of scientific infallibility' "].) But, in any event, as the trial court ruled, electrophoresis "is generally accepted in the scientific community" and, once a scientific procedure such as electrophoretic testing of bloodstains has become generally accepted, mere variations in technique or procedure go to the weight of the evidence, not its admissibility. (See *People v. Cooper* (1991) 53 Cal.3d 771, 812–813 [281 Cal.Rptr. 90, 809 P.2d 865] (*Cooper*).)

Although the foregoing rule would not have prevented defendant from showing at trial that Johnson's variations amounted to a "material scientific distinction" or material failure to use correct, scientifically accepted procedures (see *People v. Venegas* (1998) 18 Cal.4th 47, 54, 80 [74 Cal.Rptr.2d 262, 954 P.2d 525]), defendant made no such showing, and Johnson testified at length, justifying his procedures. Indeed, Johnson testified, and the trial court found, that if the stains on the right shoe had come from two different sources, Johnson's testing would have revealed that fact. Moreover, as the Attorney General observes, in addition to Johnson's availability for defense cross-examination, the prosecution did "a split on the blood" remaining on the right shoe after the compilation stain had been consumed and the defense was given splits of that "blood evidence to perform independent testing." Yet the defense offered no tests of its own to rebut Johnson's conclusions.

Similarly, defendant's observations that Johnson did not document all his work, took some inaccurate notes, did not conduct "blind" testing, deviated from the lab protocol in some respects, and failed to respond to a coworker's doubts about the accuracy of a test of blood on a carpet are all matters going to weight, not admissibility. (*People v. Farmer* (1989) 47 Cal.3d 888, 913 [254 Cal.Rptr. 508, 765 P.2d 940] (*Farmer*); *Cooper, supra,* 53 Cal.3d at pp. 812–813.) As *Farmer* explained, *Kelly* "tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied." (*Farmer, supra,* 47 Cal.3d at p. 913.) Defendant has failed to convince us that the particular technique Johnson employed constitutes a "material scientific distinction" from the general electrophoretic methodology discussed in our prior published decisions. (*People v. Venegas, supra,* 18 Cal.4th at p. 54.)

For all the reasons stated, we conclude that defendant's reliance on *Kelly*'s first prong (demonstrating general acceptance in the scientific community) to contend the test results on the tennis shoes were inadmissible is misplaced.

*2. Johnson's qualifications*—*Kelly*'s second prong requires that the testifying expert be properly qualified to testify regarding the reliability of the scientific technique used. Defendant first complains that Johnson was linked to law enforcement, and that he lacked the scientific background and impartiality to be qualified to establish the reliability of his "compilation technique," whereby he treated all the right shoe stains as coming from a single source. But, as we have seen, the scientific community already had generally accepted the electrophoretic testing of dried bloodstains, and Johnson's variations in technique went to weight, not admissibility. (*Cooper, supra,* 53 Cal.3d at pp. 812–813.)

Johnson was fully qualified to perform electrophoretic testing and to relate the results. He had been a criminalist with the San Bernardino Sheriff's crime lab for 10 years by the time he testified, had taken several courses on serological testing and blood spatters, had written his master's thesis on the subject of electrophoresis, and read journals and attended study groups to keep current on new developments. By the time of trial, he had qualified as an electrophoretic testing expert in approximately seven cases. We find defendant's attack on Johnson's qualifications meritless.

*3. Johnson's testing methods*—Defendant next argues that, under *Kelly*'s third prong, Johnson's testing methods were not shown to be correct scientific procedures. (See *People v. Venegas, supra,* 18 Cal.4th at pp. 81–83; *People v. Pizarro* (2003) 110 Cal.App.4th 530, 622–633 [3 Cal.Rptr.3d 21].) Much of

this argument mirrors defendant's previously discussed criticisms regarding the supposed lack of general acceptance of Johnson's methodology. Defendant repeats his meritless assertion that the prosecution failed to prove Johnson's compilation technique was one that other scientists would have accepted. Defendant also contends that the prosecution failed to show that the scientific community drafted or approved the protocol the crime lab recommended and the slightly modified one Johnson actually used. In addition, defendant criticizes Johnson's failures (1) to have another lab criminalist provide a second, confirming "reading" of all his test results, (2) to perform "blind" tests to eliminate possible tester bias, and (3) to document more accurately his testing procedures. As indicated above, these matters were appropriately presented to the trier of fact to consider in weighing the accuracy of Johnson's conclusions, but none of them affected the admissibility of the test results themselves. (*Cooper, supra*, 53 Cal.3d at pp. 812–813; *Farmer, supra*, 47 Cal.3d at p. 913.)

Defendant next focuses on Johnson's procedures in calculating the test results' statistical significance. As noted, Johnson testified that about 1.7 percent of San Bernardino County's general population (including Pearl Hails) would have an enzyme pattern consistent with that found on the right shoe; 9.8 percent of the population (and Pearl) would have an enzyme pattern consistent with the stain on the left shoe. Without exploring the matter further, defendant questions whether the prosecution carried its burden of proving that Johnson's choice of databases and method of calculating population frequency were scientifically correct. Defendant acknowledges that the trial court directed Johnson to calculate the statistical frequency using Riverside County and San Bernardino County statistics. Ultimately only San Bernardino County statistics were presented, presumably because the crime was committed in that county. Defendant, who objected to the statistical evidence only under Evidence Code section 352 (evidence more prejudicial than probative), now complains that the record fails to show why San Bernardino County was the proper database, and also whether Johnson's calculations were statistically correct. Significantly, at trial defendant did not, and does not now, point to evidence contradicting Johnson's conclusions. Defendant simply questions the sufficiency of Johnson's explanation regarding his methodology, which he more appropriately should have done at trial.

The Attorney General observes that our cases allow this kind of statistical blood-group evidence. (See *People v. Pride* (1992) 3 Cal.4th 195, 241 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Fierro, supra*, 1 Cal.4th at p. 215.) Here, the trial court ruled that questions regarding the proper database went to weight, not admissibility. After a hearing in which Johnson explained how he calculated the general population frequency results, the court found his procedures were correct. Defendant gives us no reason to disagree. Accordingly, we remain convinced that the "procedures utilized in the case at hand"

complied with the electrophoretic methodology that already has "passed muster under the central first prong of the *Kelly* test." (*People v. Venegas, supra*, 18 Cal.4th at p. 81.)

■ We conclude that the court did not err in admitting the evidence of electrophoretic testing of the bloodstains on either of the tennis shoes found in defendant's garage. Accordingly, we need not reach the question whether any error in admitting this evidence prejudiced the defense. We note that defendant claims "[t]he purported bloodstains and Johnson's interpretation thereof was the only physical evidence linking appellant to the killings" of the Hailses. We simply observe that, assuming arguendo the test results from the compilation of stains from the *right* tennis shoe were erroneously admitted into evidence under *Kelly*, other evidence convincingly demonstrated defendant's guilt, including blood consistent with Pearl's found on the *left* tennis shoe, the blood on defendant's patio that was consistent with Hubert's blood but not that of the defendant, defendant's being seen with the Hailses a few days before their bodies were discovered, the missing employee notebook coupled with defendant's fingerprint on the crumpled and seemingly discarded ledger sheet containing defendant's work record and starting time for July 9, 1992, defendant's unexplained act of driving Hubert's truck, which contained a jewelry box similar to that missing from the Hailses' home, and defendant's sale of the Hailses' missing stereo speakers.

## C. *Destruction of Evidence*

Defendant next contends the prosecution destroyed "critical" pieces of evidence prior to trial, namely, the trash bag in which the bloodstained tennis shoes were found in defendant's garage, the electrophoretic gel plates on which Johnson tested the stains found on those shoes, and the book of parolee photos that the officers showed to Gina and Cruz Wilcox to assist them in obtaining an identification. Defendant contends destruction of these items violated his due process right to view all evidence of an apparent material and exculpatory nature. (See *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 109 S.Ct. 333]; *California v. Trombetta* (1984) 467 U.S. 479, 488–489 [81 L.Ed.2d 413, 104 S.Ct. 2528].) To the contrary, we conclude that destruction of these items did not amount to a violation of defendant's due process rights.

*1. Trash bag*—Defendant first complains that the investigating officers failed to preserve the trash bag found in defendant's garage that contained the tennis shoes and a letter from "Joe." At the preliminary hearing, Officer Paredes testified he found the bloodstained shoes in a shopping bag containing other common household trash. Detective Duffy testified the bag contained ordinary trash ("miscellaneous milk cartons, liquid trash," and no

writings other than the note from "Joe"), which he neither inventoried nor photographed. On learning that the officers preserved neither the bag nor its other contents, defendant moved for sanctions, arguing that the defense was thereby prevented from trying to show that other persons might have had access to the bag. (Evidently, some other persons, including defendant's brother, may have stored items in the garage.) Following a hearing, the court denied sanctions, ruling that the officers had no duty to gather physical evidence merely because it might prove useful to the defense.

Defendant speculates that he might have discovered items linking other persons to the bloodstained shoes. As the Attorney General observes, defendant failed to show the trash bag actually contained possibly exculpatory evidence, or that the officers exercised bad faith in destroying it. (See, e.g., *Arizona v. Youngblood, supra*, 488 U.S. at pp. 57–58; *People v. Roybal* (1998) 19 Cal.4th 481, 509–510 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

2. *Gel plates*—Next, defendant contends the prosecution improperly failed to preserve the four gel plates used in the electrophoretic testing of the stains on the tennis shoes. At an evidentiary hearing, Johnson, the crime lab criminalist who performed the tests, and Lightfoot, his supervisor, testified regarding the lab's procedures. Testing involved placing gel on a glass plate, placing blood samples in or on the gel, running electrical current through the gel, causing various enzymes to migrate, staining the enzymes to make them visible, and examining the results to determine whether sufficient banding occurred to reveal the nature of the enzymes present. After a plate has been tested, the results are read, photographed, and entered in a logbook. The gel is then discarded and the plate is reused.

Johnson testified that the gels were destroyed because the lab could not afford to buy new plates for every test, and that he knew of no lab that preserved individual gel plates. Additionally, he explained that the plates would be useless because the various separated proteins and enzymes would diffuse into the gel and become a blur. The trial court denied sanctions, finding that preservation of the plates would have preserved no potentially useful evidence because of the likelihood of flaking, fading, or other degradation. The court also found no evidence of bad faith on the prosecution's part, as defendant had the opportunity to examine the photographs and test the stains himself.

Defendant notes that, although defense counsel received samples of the bloodstains found on the shoes, counsel never received samples either of Pearl's blood or of the stains that Johnson actually tested from the right tennis shoe, as the testing entirely consumed those stains. The record fails to show, however, that defense counsel ever requested and was refused samples

of Pearl's blood, which presumably was available. And, as noted above, Johnson properly could assume that all of the stains on the right shoe came from the same source. Thus, defendant had ample means of independently testing the remaining stains on the right shoe as well as the remaining portion of the single stain on the left shoe. Defendant also points to supposed discrepancies in the log reports and photographs and to an inconsistent result that another crime lab technician, Patricia Lough, a "second reader" of the test results, reached. But the defense did not challenge Johnson's testimony explaining or minimizing the significance of these inconsistencies. Moreover, defendant was free to raise all these inconsistencies at trial in an attempt to cast doubt on Johnson's testimony. There is no indication that preservation of the gel plates themselves would have added any additional helpful defense evidence.

We conclude that the court did not err in refusing to sanction the prosecution for failing to preserve the gel plates used in the electrophoretic testing.

*3. The parolee book*—Defendant next contends the prosecution failed to preserve the book of parolee photos in the precise format shown to Cruz and Gina Wilcox in an attempt to secure their identification of the man who stood next to the Hailses' white Toyota truck in front of their house on the morning of July 10, 1992. Gina picked defendant's photo from this book containing about 95 Polaroid photos, including many of persons who did not resemble defendant.

Sergeant Brown photocopied the book shown to the Wilcoxes on the same day they viewed it. But Officer Paredes testified that, to keep the book current, he earlier had replaced defendant's photo with a more recent one. Sergeant Brown's photocopy thus apparently included the newer version, not the one the Wilcoxes viewed. Officer Paredes also later updated several other parolees' photos. When, on defense motion, the court ordered the prosecution to produce the photo book, Paredes removed these newer photos in an effort to restore the book to the condition he assumed the Wilcoxes had seen. Evidently, Paredes's field files contained three similar photos of defendant, so it was unclear which one the Wilcoxes actually viewed. The defense elected not to show these photos to Gina Wilcox so she could identify the photo she viewed earlier. The photo book Paredes reconstructed lacked about 10 photos shown in Sergeant Brown's photocopy, and it contained photos of four parolees not included in that photocopy.

The trial court nonetheless denied defendant's motion for sanctions for failure to preserve the photo book in the precise format Gina Wilcox saw, finding (1) the photo book would have contained no apparent exculpatory

evidence, and (2) Officer Paredes acted in good faith, though perhaps incompetently, in changing the book's photos. The court found that the best evidence of what the parolee book looked like when Gina Wilcox saw it was the photocopy Sergeant Brown made, noting that the only alteration to the book at that point was the substitution of a more recent photo of defendant.

At trial, Gina Wilcox testified that she selected defendant's photo from a book of approximately 100 photos. Cruz Wilcox testified she picked defendant from a subsequent live lineup. Both women identified defendant at trial as the man standing near the Hailses' truck.

Defendant claims the original parolee book was "material and favorable" evidence essential to permit the defense to show the book was impermissibly suggestive. But this argument is entirely speculative—defendant offers no actual evidence of undue suggestiveness, and the trial court found none. The defense had access to Sergeant Brown's photocopy of the book, plus the three photos of defendant that Gina Wilcox might have viewed, but defendant mounted no suggestiveness claim. Although the defense might have used the original book, the court found no bad faith involved in its alteration. Under the case law, the destruction of evidence claim fails. (See, e.g., *Arizona v. Youngblood, supra*, 488 U.S. at pp. 57–58; *People v. Roybal, supra*, 19 Cal.4th at pp. 509–510.)

■ *4. Failure to give instruction on destruction of evidence*—Defendant requested an instruction that would have allowed the jury to draw inferences more favorable to the defense, based on the prosecution's failure to preserve the foregoing evidence. (See *People v. Zapien* (1993) 4 Cal.4th 929, 964 [17 Cal.Rptr.2d 122, 846 P.2d 704].) As we have held, however, that instruction need not be given where, as here, no bad faith failure to preserve the evidence was shown. (*People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

We conclude that destruction of the trash bag, gel plates, and photo book did not amount to a violation of defendant's due process rights.

### D. *Denial of Motion to Exclude Pretrial and In-court Identifications*

Defendant contends the court erred in denying his motions to exclude Gina Wilcox's, Cruz Wilcox's, and Ruth Eyer's pretrial and in-court identifications of him. He claims that, by admitting such evidence, the trial court violated his "rights to due process, to counsel, to the effective assistance of counsel, to confrontation, and to a reliable determination of both guilt and penalty, in violation of article I, sections 1, 7, 15, 16 and 17 of the California Constitution and the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

*1. Identifications by Gina and Cruz Wilcox*—As noted, after Gina Wilcox selected defendant's photo from a photo book, Cruz Wilcox picked defendant from a live lineup, and both women identified him at trial as the man standing near the Hailses' truck.

*a. Right to counsel*—Defendant first argues that he was impermissibly denied his right to counsel at the live lineup held on July 22, 1992. By that time, Gina Wilcox had tentatively identified defendant. When Detective Madril interviewed defendant on July 13, he admonished defendant pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. Although defendant asked for counsel after hearing his rights, none was appointed before the live lineup; evidently, the San Bernardino County Public Defender's office was taking no more special circumstance cases.

By the time of the lineup, no criminal complaint had yet been filed against defendant, and the evidence was in conflict as to whether a decision to file had already been made when the lineup was held. Pyle, the local deputy district attorney, indicated that the main office of the district attorney in San Bernardino would decide whether to charge defendant with special circumstances. Pyle testified that he wished to conduct the live lineup, interview more witnesses, and perhaps view the blood test analysis before filing a complaint. Pyle noted that because defendant faced a parole hold, he need not rush to file such a complaint. Public Defender Bynum, however, recalled Pyle's telling him a decision had been made to charge defendant with murder, and the only uncertainty was whether special circumstances would be alleged.

The homicide unit held the lineup on July 22, 1992, at the West Valley Detention Center. The district attorney's office was not involved in setting up the lineup or in discussing whether defendant should have counsel present. Witness Cruz Wilcox selected defendant as the man standing beside the Hailses' truck. A criminal complaint was filed later the same day.

The trial court denied defendant's motion to suppress the lineup identification for failure to appoint counsel for him. The court found that at the time of the lineup, law enforcement officers were still investigating the case and gathering evidence. The court relied on case law indicating that the right to counsel does not attach until formal adversarial criminal proceedings are initiated.

■ Defendant acknowledges the general rule that the right to counsel attaches only when judicial proceedings have commenced. (E.g., *Brewer v. Williams* (1977) 430 U.S. 387, 398 [51 L.Ed.2d 424, 97 S.Ct. 1232]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1223 [842 P.2d 1, 14 Cal.Rptr.2d 702].) He argues, however, that once suspicion had focused on him as the Hailses'

killer, and he had asked for counsel, it was improper to hold a lineup without first appointing counsel for him. In *United States v. Wade* (1967) 388 U.S. 218, 227 [18 L.Ed.2d 1149, 87 S.Ct. 1926], the high court held that defendants are entitled to counsel at a *postindictment* lineup to preserve their basic right to a fair trial. The *Wade* court recognized the "grave potential for prejudice" inherent in any confrontation between the accused and the victim or witnesses held for identification purposes. (*Id.* at pp. 236–237.)

Thereafter, in *Kirby v. Illinois* (1972) 406 U.S. 682, 689, 691 [32 L.Ed.2d 411, 92 S.Ct. 1877] (*Kirby*), a plurality of the United States Supreme Court reaffirmed that the right to counsel does not attach until a judicial criminal proceeding such as an indictment is initiated or a complaint is filed. In *Kirby*, the officers suspected the defendant and an accomplice of robbery and, weeks before any charges were filed, brought them to the police station for a "showup" with the robbery victim, who identified them as the robbers. The dissenters in *Kirby* felt that the initiation of formal proceedings was irrelevant to the question whether counsel is necessary at a pretrial confrontation for identification purposes. (406 U.S. at p. 696 (dis. opn. of Brennan, J.).)

Subsequent high court cases have confirmed the rule of the *Kirby* plurality. (E.g., *United States v. Gouveia* (1984) 467 U.S. 180, 188 [81 L.Ed.2d 146, 104 S.Ct. 2292], and cases cited ["The view that the right to counsel does not attach until the initiation of adversary judicial proceedings has been confirmed by this Court in cases subsequent to *Kirby*"].)

Defendant observes that *Kirby* is factually distinguishable from the present case, in that here defendant had been in custody on a parole hold for more than a week before the lineup was held, and the investigation had already begun, whereas in *Kirby* the showup at the police station was held the same day the defendant was arrested, and he was not charged until many weeks later. (See *Kirby, supra*, 406 U.S. at pp. 684–685.) But nothing in *Kirby* or subsequent federal case law indicates that these distinguishing facts would have made a difference in the ultimate conclusion that, until formal charges were filed, counsel was not required to be present at the lineup under the federal Constitution.

Accordingly, there was no violation of defendant's right to counsel under the federal Constitution.

■ The California Constitution does afford a suspect a right to counsel at a preindictment lineup. (*People v. Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927].) However, the exclusionary rule set forth in *Bustamante* was "abrogated by the passage of Proposition 8, an initiative adopted by the voters of this state on June 8, 1982. Among other provisions,

Proposition 8 added section 28 to article I of the state Constitution. That section abrogated judicial decisions requiring exclusion of relevant evidence from criminal proceedings, except as compelled by the federal Constitution or other statutes not implicated here. [Citation.] As defendant's crime occurred after the adoption of Proposition 8, the exclusionary rule[] of *Bustamante . . .* ha[s] no application to this case." (*People v. Johnson, supra,* 3 Cal.4th at pp. 1222–1223, fn. omitted.)

■ *b. Identification procedures not unduly suggestive or unreliable—* Defendant maintains that the procedures used in obtaining the pretrial identifications by Cruz and Gina Wilcox were unduly suggestive in several respects, and that the resulting identifications were unreliable and therefore inadmissible. (See, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519], and cases cited.) The cases hold that despite an unduly suggestive identification procedure, we may deem the identification reliable under the totality of the circumstances, after we consider such factors as the witness's opportunity to view the suspect at the time of the offense, the witness's degree of attention at that time, the accuracy of the witness's prior description, the level of certainty the witness expressed when making the identification, and the lapse of time between the offense and the identification. (*Ibid.*)

Defendant first maintains the identification procedures were unduly suggestive. He observes that the Wilcoxes were permitted to observe and confer with each other during the various identification procedures, including their interview with the officers relating the suspect's description, the assembly and viewing of composite drawings of him, the review of the parolee book, and the physical lineup itself. (See *Gilbert v. California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].) Defendant "assumes" that Gina and Cruz Wilcox conferred with each other before, during, and after these procedures, but he cites no evidence of any actual conferring or other influence these witnesses exerted on each other. The Attorney General notes that, although Gina and Cruz Wilcox were together during the identification procedures, Gina, but not Cruz, picked defendant's picture from the parolee book, and Cruz, but not Gina, positively selected defendant at the live lineup. (During the lineup, Gina picked defendant and another man as possible matches.)

When first interviewed on July 12, Cruz Wilcox was unable to provide a description of the man she had seen by the truck, yet at the live lineup on July 22, she picked defendant. Defendant assumes Cruz's identification resulted from her hearing her daughter Gina's description and viewing the composite drawings as well as the photograph Gina selected from the parolee book on July 13. Defendant also notes that most of the photos in the parolee book were of persons looking nothing like him, and at the live lineup, he was

much shorter than the other men. Defendant cites cases holding that it would be impermissibly suggestive to hold a lineup in which only the defendant fit the witnesses' description. (*Foster v. California* (1969) 394 U.S. 440, 442–443 [22 L.Ed.2d 402, 89 S.Ct. 1127]; *People v. Caruso* (1968) 68 Cal.2d 183, 187–188 [65 Cal.Rptr. 336, 436 P.2d 336].)

The Attorney General, on the other hand, observes that, under the cases, defendant has the burden of showing that the identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." (E.g., *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 [9 Cal.Rptr.2d 628, 831 P.2d 1210] (*DeSantis*).) A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 88 S.Ct. 967].)

We have held that an identification procedure is considered suggestive if it "caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367 [63 Cal.Rptr.2d 1, 935 P.2d 708].) As for defendant's being the shortest man in the live lineup, the Attorney General observes that the case law does not require that a lineup contain persons resembling the defendant in appearance. (*DeSantis, supra,* 2 Cal.4th at p. 1224; *People v. Gordon* (1990) 50 Cal.3d 1223, 1241, 1243 [270 Cal.Rptr. 451, 792 P.2d 251]; *People v. Blair* (1979) 25 Cal.3d 640, 661 [159 Cal.Rptr. 818, 602 P.2d 738].) The trial court examined photos of the lineup participants and other information regarding them. It found that defendant was "not significantly shorter" than the other men in the lineup, that all were "white, male adults, relatively similar in body build," that no one "obviously stands out" in terms of height and weight. The court concluded that these circumstances did not "even come close to the kind of gross disparity that would require a suppression." Moreover, the fact that defendant alone appeared in both a photo lineup and a subsequent live lineup does not per se violate due process. (*DeSantis, supra,* 2 Cal.4th at p. 1224.)

We agree with the trial court that defendant has failed to show that the various identification procedures were unduly suggestive. Accordingly, we need not address the Attorney General's alternative arguments that, assuming these procedures were overly suggestive, the Wilcox's identifications were reliable under the totality of the circumstances (see *People v. Cunningham, supra,* 25 Cal.4th at p. 989), and any error in admitting the identifications was harmless.

   *2. Identification by Ruth Eyer*—When first contacted by the officers, Ruth Eyer described the man she met at the Hailses' home as clean cut or clean

shaven and in his 20's, but she doubted she could identify him because she had only seen him briefly. At a live lineup on February 8, 1993, Eyer was unable to make a positive identification. But immediately after the lineup, she told District Attorney Bruins that she was not positive but could eliminate some of the men and wanted to speak further with him about the lineup. Rather than discuss the matter with others present, Bruins told her they would talk later. The next day, Eyer told Bruins that she felt two of the men in the lineup (Nos. 4 & 6) were possibilities, and that if forced to chose, she would select No. 6, who was defendant. At the preliminary hearing, Eyer tentatively identified defendant as the man she had met earlier.

Defendant now "infers" that some suggestive influence intervened between the lineup and her remarks to Bruins on the next day. But Eyer testified at the preliminary hearing that she discussed her identification with no other witnesses, and the trial court, following a hearing, found no grounds for suppressing her identification. As the trial court observed, Eyer's hesitation and tentativeness in identifying defendant might well have served as ammunition "to impeach" her credibility, but no grounds exist for suppressing her identification of him. For all the foregoing reasons, we agree.  .

### E.  *Admission of Defendant's Letter to His Landlord*

Defendant contends the court erred in admitting the contents of a July 7, 1992, letter he wrote to his landlord apologizing for not yet finishing some work he had promised. In the letter, defendant explained that he had been unemployed and lacked the funds to finish the work, but that he was now employed and working for the Hailses, whose phone number he relayed. The letter indicated that defendant would be able to finish the work by the end of July. Defendant objected to the letter and offered to, and eventually did, stipulate that he had a working relationship with the Hailses on July 8 and several days before then. Nevertheless, the court admitted the letter, finding it relevant to show that a relationship existed between defendant and the victims, that he was going to be at their house, and that he had a possible monetary motive to steal from them.

Defendant cites cases holding that evidence presented solely to show a defendant's poverty carries a risk of undue prejudice and accordingly is inadmissible to prove a motive to commit robbery or theft. (E.g., *People v. Koontz* (2002) 27 Cal.4th 1041, 1076 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Wilson* (1992) 3 Cal.4th 926, 939 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) But, as the court noted, the letter here was relevant on several grounds. It showed defendant worked for the Hailses and intended to do so in the future, thus circumstantially placing him at the scene of the crime. It even supplied the victims' telephone number, suggesting, as the court found, that

the recipient could call him at their residence. Defendant's offer to stipulate to part of what the letter stated did not negate its relevance. The prosecution was entitled to prove these relevant facts out of defendant's own hand. (See *People v. Scheid* (1997) 16 Cal.4th 1, 16–17 [65 Cal.Rptr.2d 348, 939 P.2d 748].) Moreover, the letter was not particularly prejudicial. It was not evidence of poverty, but rather simply a statement that defendant had been unemployed but was now gainfully employed. We see no abuse of discretion in admitting the letter.

Moreover, any error was harmless. As noted, the letter was not particularly prejudicial. Indeed, although it stated that defendant had been unemployed, it also stated that he was no longer. The latter statement supported an argument that he *lacked* a motive to rob the Hailses. Additionally, ample evidence other than the letter implicated defendant in the Hailses' murder, including his taking their truck and driving in it on or about the date of the murders, his taking and selling their stereo speakers, the missing employee notebook, defendant's work record sheet showing that he started working for them at 3:30 p.m. on July 9, found crumpled on their living room floor, his latent palm prints on their truck, similar matching prints found on the crumpled ledger sheet, and the bloodstained tennis shoes found in his garage.

### F. *Joe Bryant's Statement to Sergeant Allen*

At the guilt phase of trial, the prosecution called Joe Bryant, the Hailses' neighbor. He testified he last saw them on Thursday or Friday (July 9 or 10), but he was not sure which day. The prosecutor asked Bryant whether he had told an officer he had seen them on Friday, July 10, and Bryant replied he did not think so, and if he did say that, he was mistaken. To impeach Bryant, defense counsel then called Sergeant Brown, who related that Bryant told him he had last seen Hubert Hails on Friday afternoon.

On rebuttal, the prosecution sought to call Sergeant Allen. Over defense objection, as discussed below, the court admitted Allen's testimony that he interviewed Bryant on July 11, before Sergeant Brown had arrived, and that Bryant told him he saw the Hailses either Thursday or Friday afternoon. The trial court upheld Allen's testimony on several grounds, including its being a prior consistent statement (Evid. Code, § 791) that was used to rehabilitate Bryant. Under Evidence Code section 791, subdivision (a), a witness's prior consistent statements are generally inadmissible to support his or her trial testimony *unless* evidence of a prior *inconsistent* statement has already been introduced to impeach that witness, and the consistent statement was made before the inconsistent one. The exception applies here, as Bryant's statement to Sergeant Brown was indeed inconsistent with Bryant's trial testimony, while Bryant's earlier statement to Sergeant Allen was entirely consistent with it.

Defendant first argues that Bryant was not impeached with a prior inconsistent statement because his original testimony (last seeing the Hailses either Thursday or Friday) was more in the nature of a failure of memory than an assertion of fact subject to impeachment. (See *People v. Green* (1971) 3 Cal.3d 981, 988 [92 Cal.Rptr. 494, 479 P.2d 998].) To the contrary, Bryant's trial testimony was factual in nature, reciting the words that he told an unidentified officer. Those words were sufficiently factual to justify impeachment with proof of a prior inconsistent statement to Sergeant Brown. And in turn, the supposed statement to Sergeant Brown was sufficiently inconsistent with Bryant's trial testimony to warrant introduction of the prior consistent statement to Sergeant Allen.

Defendant also complains of the prosecution's failure to disclose Sergeant Allen's testimony in a timely manner. During pretrial discovery, defendant was provided with a report by Detective Madril relating Sergeant Allen's information that Bryant told the officers he had seen the victims either Thursday or Friday afternoon. Sergeant Allen himself gave defendant no written report, because evidently no such report existed. Defendant nonetheless asked the trial court to impose discovery sanctions for failing to identify precisely the officer (Allen) to whom Bryant gave this information. The court denied sanctions, finding that Madril's report adequately identified Allen as at least knowledgeable about Bryant's statement. Indeed, defense counsel interviewed Allen before trial, evidently without discussing Bryant's statement with him.

Defendant repeats his claim the prosecution withheld information regarding the officer who spoke with Bryant, but the claim fails in light of the information that was contained in Madril's report. In any event, the defense suffered no prejudice from the nondisclosure given Bryant's trial testimony and the impeachment of it by Sergeant Brown.

### G. *Prosecutor Misconduct—Closing Argument*

Defendant contends the prosecutor, during closing argument, improperly referred to facts not in evidence. We find no prejudicial misconduct.

*1. Temperature chart*—One of the issues at trial concerned the date on which the Hailses were murdered, and, accordingly, the ambient temperature in their house was relevant to show the possible rate of decomposition of their bodies. Expert Batal testified regarding those temperatures, leading pathologist Root to conclude the Hailses were not killed as early as July 9. To challenge Batal's testimony, the prosecutor briefly showed the jury a chart that had not been placed in evidence, which indicated that Batal had requested temperatures for the year *after* the murders occurred.

On defendant's objection, the court immediately admonished the jury to disregard the chart, but it denied defendant's mistrial motion. Defendant now contends the chart was "highly prejudicial," going to "the very heart" of the defense, but the jury had already properly heard Batal explain the discrepancy in dates, so it is unlikely the chart added anything to prejudice the defense. The trial court admonished the jury to disregard the chart, and the record shows no indication that the chart contained any prejudicial material, or even that the jurors had time to review it. We find the prosecutor committed no prejudicial misconduct, and the court did not err or abuse its discretion in denying a mistrial on this ground.

2. *Acceptance in scientific community of expert Johnson's testing methods*—Defendant next contends the prosecutor improperly told the jury that the scientific community accepted prosecution expert Johnson's electrophoretic testing methods, a matter defendant claims was not supported by the evidence. The record shows that the prosecutor in closing arguments asked the jury rhetorically why the defense had failed to call its own experts to challenge Johnson's testimony, and "tell you that the method he used in testing is not accepted and was improper. The reason is because it is accepted in the scientific community."

Defendant argues that the court erred in overruling his objection based on the prosecutor's reference to facts not in evidence. The Attorney General responds that the prosecutor was entitled to comment on the state of the evidence and the absence of conflicting evidence (e.g., *People v. Kaurish* (1990) 52 Cal.3d 648, 680 [276 Cal.Rptr. 788, 802 P.2d 278]) and to draw permissible inferences from the record (*People v. Raley* (1992) 2 Cal.4th 870, 917 [8 Cal.Rptr.2d 678, 830 P.2d 712]). From the evidence that Johnson, whose scientific credentials were unchallenged, presented, and from defendant's failure to present opposing expert testimony, the prosecutor reasonably could argue that Johnson's method was accepted in the scientific community. Moreover, we find no prejudice. The prosecutor's remark was brief and not repeated during his argument. The jurors were told to base their verdict on the evidence at trial and that the statements of counsel are not evidence.

3. *Deteriorating bloodstains*—Defendant next claims the prosecutor improperly argued that the blood on the tennis shoes found in defendant's garage must have come recently from the Hailses' house because, otherwise, the blood would have deteriorated over time and become untestable. In his closing arguments, the prosecutor reviewed expert Johnson's testimony that he was uncertain when the blood got on the tennis shoes, and then asked rhetorically why anyone would throw away a good pair of shoes, answering, "Because they had blood [on] them from the Hails's [*sic*] house." The prosecutor then reminded the jurors that Johnson had testified that blood

deteriorates from heat and moisture, and he argued that if the blood had been on the shoes for a long time, it would have deteriorated. The trial court overruled defendant's objection that the argument relied on facts not in evidence.

Johnson testified as an expert that moisture and heat cause blood to deteriorate. The prosecutor's argument was a permissible inference from that evidence.

### H. *Jury Misconduct*

Defendant cites various instances of supposed jury misconduct. We find no such misconduct.

*1. News article about prosecutor's judicial campaign*—During the guilt phase of trial, Juror H. brought to the courtroom a local news article that revealed that Prosecutor Kenneth Barr was running for judicial election, had been a deputy district attorney since 1985, was a senior member of the career prosecution unit of his office, and had criticized his judicial opponent for his informal style. Nothing in the article mentioned defendant's trial or other murder or capital cases.

After questioning Juror H. briefly, the court excused him but denied defendant's motion for mistrial. The court questioned the other jurors, found that only one other juror had read the entire article, and noted that all jurors indicated they could remain fair and impartial toward defendant. The court individually admonished each remaining juror not to discuss the article or anything Juror H. may have said or done. Defendant now argues that the jurors' exposure to the article constituted misconduct requiring reversal. (See, e.g., *People v. Pinholster* (1992) 1 Cal.4th 865, 923–928 [4 Cal.Rptr.2d 765, 824 P.2d 571].) We find no prejudicial misconduct. The article contained no inherently biased material, and reading it would not have made any actual bias substantially likely. (See *In re Carpenter* (1995) 9 Cal.4th 634, 653–654 [38 Cal.Rptr.2d 665, 889 P.2d 985].) Learning that the prosecutor was seeking a judicial position or was involved with the career prosecution unit of his office was not likely to prejudice the jurors against defendant.

*2. News article reporting jury's guilty verdict*—Following the jury's guilty verdict in this case, a news article reported that defendant had been on parole when the offenses were committed, that he was arrested after making inconsistent statements to police, and that the prosecutor was urging the death penalty because defendant bludgeoned two elderly people to death with a hammer in order to take their property. Defendant moved for a separate penalty phase jury as a result of this media coverage. The trial court denied

the motion without prejudice as premature, observing that the main item of concern was the report that defendant was on parole (see *People v. Holloway* (1990) 50 Cal.3d 1098, 1111 [269 Cal.Rptr. 530, 790 P.2d 1327]), but stating that the jurors soon would learn of defendant's prior burglary conviction.

Nonetheless, the court agreed to ask the jurors through questionnaires about their exposure to the article. Only three jurors had noticed it, and none had read past the report that defendant had been found guilty. None of the three jurors stated they had read about defendant's parole, and all agreed they would base their penalty verdict on the evidence and not on anything they read in the article. Accordingly, the court denied defendant's motion for mistrial or to excuse these jurors.

Defendant argues that the news article exposed the jurors to defendant's parole status, to the fact (evidently not divulged during the guilt phase) that defendant used a hammer to kill his victims, and to the prosecutor's personal opinion regarding the suitability of a death verdict for defendant. To the contrary, we cannot assume on this record that any juror learned any of that information from the article, which the court had carefully admonished the jurors to avoid. (See, e.g., *People v. Pinholster, supra*, 1 Cal.4th at p. 927; *People v. Holloway, supra*, 50 Cal.3d at p. 1112.) We find no prejudicial misconduct.

### I.  *Instructions Diluting Prosecution's Reasonable Doubt Proof Burden*

The court instructed the jury using the standard instructions on circumstantial evidence (CALJIC Nos. 2.01, 2.02, 8.83, & 8.83.1). Defendant claims these instructions had the effect of diluting or undermining the prosecution's burden of proving defendant's guilt beyond a reasonable doubt. We have rejected the identical argument (see *People v. Crittenden* (1994) 9 Cal.4th 83, 142–144 [36 Cal.Rptr.2d 474, 885 P.2d 887]), and defendant gives us no good reason to reconsider that decision now.

The court also gave various other standard instructions on such matters as the respective duties of judge and jury (CALJIC No. 1.00), discrepancies in testimony (CALJIC No. 2.21.1), weighing conflicting testimony (CALJIC No. 2.22), sufficiency of evidence of one witness (CALJIC No. 2.27), and motive (CALJIC No. 2.51). Defendant claims these instructions also diluted the reasonable doubt standard, but, again, we have rejected similar claims on the basis that the court's instructions on evaluating evidence and testimony must be read in context with its other instructions on the prosecution's burden of proving its case beyond a reasonable doubt. (E.g., *People v. Maury* (2003) 30 Cal.4th 342, 429 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Snow* (2003) 30 Cal.4th 43, 97 [132 Cal.Rptr.2d

271, 65 P.3d 749]; *People v. Frye* (1998) 18 Cal.4th 894, 958 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Crittenden, supra,* 9 Cal.4th at p. 144.)

### J. *Instruction on Motive*

■ The court instructed the jury (CALJIC No. 2.51) that although a defendant's motive is not an element of the crime charged and thus need not be proved, the jury could consider motive or lack of it as a circumstance in the case: "Presence of motive may tend to establish guilt," and lack of motive may show innocence. Defendant claims this instruction allowed the jury to find him guilty if he had a motive to commit the crimes charged, and thus shifted the proof burden away from the prosecution. We have rejected this argument in prior cases, as the motive instruction clearly states that motive alone is insufficient to establish guilt. (See, e.g., *People v. Snow, supra,* 30 Cal.4th at pp. 97–98; *People v. Frye, supra,* 18 Cal.4th at p. 958.)

## III.  PENALTY PHASE ISSUES

### A. *Prosecution's Pretrial Offer*

■ The court refused to admit, as potentially mitigating evidence, the fact that the prosecutor, prior to trial, had offered defendant a sentence of life imprisonment without possibility of parole in exchange for a guilty plea. Our prior cases have rejected similar claims on the basis that rejected plea bargains such as this do not bear on the defendant's character, his prior record, or the circumstances of the crime, and therefore would not constitute proper mitigating evidence. (See *People v. Zapien, supra,* 4 Cal.4th at pp. 988–990; *People v. Fauber* (1992) 2 Cal.4th 792, 857 [9 Cal.Rptr.2d 24, 831 P.2d 249].) The trial court in this case also observed that pretrial offers of plea bargains in capital cases can be motivated by many factors (e.g., expenditures of time, effort, and resources) unrelated to the appropriateness of the death penalty in a particular case. We find no error.

### B. *Defendant's Proposed Penalty Instructions*

■ Defendant proposed several special instructions to cover various aspects of his defense. Defendant cites case law requiring the court to instruct on the defense theories of the case, either where the defendant clearly relies on such defenses, or where substantial evidence exists to support them. (See *People v. Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826]; *People v. Stewart* (1976) 16 Cal.3d 133, 140 [127 Cal.Rptr. 117, 544 P.2d 1317].) The Attorney General observes, however, that the court has no duty to give argumentative, duplicative, incomplete, or erroneous instructions. (E.g., *People v. Benson* (1990) 52 Cal.3d 754, 805, fn. 12 [276 Cal.Rptr. 827,

802 P.2d 330]; *People v. Wright* (1988) 45 Cal.3d 1126, 1135–1137 [248 Cal.Rptr. 600, 755 P.2d 1049]; *People v. Lucero* (1988) 44 Cal.3d 1006, 1021 [245 Cal.Rptr. 185, 750 P.2d 1342].) As will appear, each of the proposed instructions at issue falls into one or more of these categories.

*1. Death as a less severe punishment than life imprisonment without parole*—Defendant proposed to instruct the jury that they would violate their duties if they viewed the death penalty as a less severe penalty than life imprisonment without parole. Defendant contends this instruction would have clarified to the jurors that they could not properly consider death a more merciful option. But other sentencing instructions (see, e.g., CALJIC No. 8.88), coupled with the jurors' own common sense, clearly indicated that death was always the ultimate punishment. The proposed instruction was argumentative, duplicative, and unnecessary.

*2. Considering the first degree murder and special circumstance findings*—Defendant proposed to instruct the jurors that they could not consider the guilty verdict and special circumstance findings as aggravating factors. The court properly refused the proposed instructions as unnecessary in light of the other instructions, and as inconsistent with CALJIC No. 8.85, which allows the jurors to consider all the evidence in the case, including the circumstances of the crime and the existence of any special circumstances found true. (See *People v. Siripongs* (1988) 45 Cal.3d 548, 581, fn. 11 [247 Cal.Rptr. 729, 754 P.2d 1306].) We observed in *Siripongs* that, although the jury could not properly impose the death penalty merely because the defendant had committed a murder, the jury was not instructed it could consider the crime itself, but only the *circumstances* surrounding the crime, as an aggravating circumstance. (*Ibid.*)

Defendant also proposed an instruction barring the jurors from considering as an aggravating factor any fact used in finding defendant guilty of first degree murder, unless that fact establishes something in addition to an element of the crime. The court properly refused this instruction as unnecessary in light of an instruction actually given, which told the jurors not to consider the same facts more than once in determining the presence of aggravating factors. We find no error.

*3. Defining mitigating circumstances*—Defendant proposed several instructions on the subject of mitigating evidence. His proposed instruction No. 12 explained that mitigating evidence could include the circumstances surrounding defendant's crime, defendant's background and character, and any other circumstance that extenuated the gravity of the crime, even though not a legal excuse. The proposed instruction then gave as examples of mitigating evidence defendant's lack of sophistication or professionalism, that defendant

did not threaten witnesses, try to escape, or use force to avoid arrest, and that defendant committed several crimes within the same time period, indicating "a single period of aberrant behavior."

Defendant's proposed instruction No. 14 included within the category of mitigating factors any sympathetic or compassionate aspect of defendant's background, character, or social, psychological, or medical history, whether or not related to the crimes. The proposed instruction then gave as examples such factors as whether defendant's psychological growth and development affected his adult personality, whether he suffered from a low sense of self-esteem, learning disabilities, low intellect, or brain dysfunction, whether he was subjected to cruelty as a child, and whether his family upbringing contributed to his criminal conduct.

Defendant's proposed instruction No. 16 simply recited evidence showing defendant was physically abused as a child and was not treated for his hyperactivity or dental problems and that these may be considered mitigating factors.

As the trial court ruled, all these instructions were flawed. These were not legitimate pinpoint instructions focusing on the defense's legal theories; they were instead improper attempts to highlight particular items of evidence. (See, e.g., *People v. Catlin* (2001) 26 Cal.4th 81, 172–174 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Earp* (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Noguera* (1992) 4 Cal.4th 599, 648 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) The court had no obligation to give an instruction containing only a partial list of mitigating factors. (*People v. Cox* (1991) 53 Cal.3d 618, 678, fn. 21 [280 Cal.Rptr. 692, 809 P.2d 351].) The standard instructions the court gave here, including modified CALJIC No. 8.85, factor (i), adequately conveyed the full range of mitigating evidence to be considered by the jury. (*People v. Catlin, supra*, 26 Cal.4th at pp. 173–174.)

*4. One mitigating factor sufficient*—Defendant proposed to instruct the jury that one mitigating factor alone could justify a verdict of life imprisonment without parole. As we held in prior cases, the court correctly refused the instruction. (*People v. Breaux* (1991) 1 Cal.4th 281, 316–317 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People v. Williams* (1988) 45 Cal.3d 1268, 1322 [248 Cal.Rptr. 834, 756 P.2d 221].) The other standard instructions (e.g., modified CALJIC No. 8.85, factor (i); modified CALJIC No. 8.88) amply covered the point. (See, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 569–570 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) Moreover, the instruction was misleading, because it wrongly implied that at least one mitigating factor was needed to justify a sentence of life imprisonment without parole. (See *People v. Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

*5. No unanimity required for mitigating factor*—Defendant requested an instruction telling the jurors they could decide for themselves individually whether mitigating factors existed, and that unanimity was not required. We have previously considered and rejected this argument, reasoning that the standard instructions (CALJIC No. 8.88, which was also given here) adequately covered the point. (*People v. Smith* (2003) 30 Cal.4th 581, 639 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Breaux, supra*, 1 Cal.4th at pp. 314–315.) The Attorney General observes that defendant declined the court's offer to instruct that no requirement exists for unanimity "on any particular *aggravating circumstance* or mitigating circumstance." (Italics added.)

C. *Constitutionality of Statutes and Instructions on Burden of Proof at Penalty Phase*

Defendant claims the state's statutes and jury instructions regarding the prosecution's burden of proof are constitutionally inadequate. He complains the court failed to instruct that the prosecution has the burden of proving beyond a reasonable doubt that (1) particular aggravating factors exist, (2) these aggravating factors outweigh the mitigating ones, and (3) death is the appropriate penalty. Our case law has rejected this argument on the basis that the jury's penalty selection process is a moral and normative one for which assignment of a proof burden would be inappropriate. (E.g., *People v. Welch* (1999) 20 Cal.4th 701, 767 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Holt* (1997) 15 Cal.4th 619, 683–684 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Similarly, our case law has rejected the argument, which defendant also raises, that the prosecution should shoulder a burden of persuasion regarding the penalty determination. (*People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1135–1136 [12 Cal.Rptr.3d 592, 88 P.3d 498].)

We do not agree that the high court decisions in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2002) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] have altered the foregoing analysis. (*People v. Monterroso* (2004) 34 Cal.4th 743, 796 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *People v. Prieto* (2003) 30 Cal.4th 226, 262–264 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

Defendant likewise claims the sentencing instructions were constitutionally flawed because they failed to require that the jurors agree unanimously on the aggravating factors on which they relied to reach a death verdict. Again, we have repeatedly rejected the argument. (*People v. Panah* (2005) 35 Cal.4th 395, 499 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Combs, supra*, 34 Cal.4th at p. 868.)

### D. *Overbreadth and Vagueness of Section 190.3, Factor (a)*

■ Defendant next argues that section 190.3, factor (a), which allows the jury to consider the circumstances of the crime as a possible aggravating factor, is so broad and ill defined that it encourages the jurors to impose the death penalty arbitrarily and capriciously. Defendant gives examples from other California cases showing prosecutors have relied on a wide range of facts in arguing that the circumstances of the crime warrant being treated as an aggravating factor. But the case law rejects the vagueness and overbreadth arguments. (See *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Panah, supra,* 35 Cal.4th at p. 499; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531].) As stated in *Tuilaepa,* "The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." (512 U.S. at p. 976.)

### E. *Failure to Delete Inapplicable Sentencing Factors*

Defendant complains the court failed to delete from the jury instruction based on CALJIC No. 8.85 all listed aggravating factors that did not apply in the case. We have repeatedly rejected this argument. (E.g., *People v. Panah, supra,* 35 Cal.4th at p. 499; *People v. Carpenter, supra,* 21 Cal.4th at p. 1064.)

### F. *Inclusion of Restrictive Adjectives in List of Potential Mitigating Factors*

Defendant argues the court erred in giving the standard instructions that use such adjectives as "extreme" and "substantial" in listing the various statutory mitigating sentencing factors. We have repeatedly rejected this argument. (E.g., *People v. Panah, supra,* 35 Cal.4th at p. 500; *People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

### G. *Lack of Written Findings Regarding Aggravating Circumstances*

Defendant claims the state's death penalty law and instructions are invalid because they fail to require the jurors to make written findings about the aggravating factors that justified their imposing the death penalty in this case. We have repeatedly rejected this argument. (E.g., *People v. Panah, supra,* 35 Cal.4th at p. 499; *People v. Fauber, supra,* 2 Cal.4th at p. 859.)

H. *Equal Protection Violation Stemming from Denial of Procedural Protections to Capital Defendants*

Defendant next contends that, even if the absence of the foregoing procedural protections does not render the state's death penalty procedures unconstitutional, providing some of those protections (e.g., disparate sentence review, written findings, unanimous jury agreement on aggravating factors or commission of violent crimes) to noncapital defendants denies equal protection to those facing the death penalty. We have rejected similar arguments in prior cases. (E.g., *People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244] [disparate sentence review]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [same].)

I. *Constitutionality of Instructions Defining Jury's Sentencing Discretion and the Deliberative Process*

Defendant contends that the standard jury instruction (based on CALJIC No. 8.88) defining the scope of the jury's sentencing discretion and the nature of its deliberative process are unconstitutional for various reasons. As will appear, we have repeatedly rejected these arguments in prior cases.

*1. Reference to "substantial" aggravating circumstances*—Defendant argues that the instruction (CALJIC No. 8.88) impermissibly asked the jury to decide whether the aggravating circumstances were so substantial in comparison with mitigating ones as to justify the death penalty. Defendant believes the term "substantial" is too vague to give adequate guidance to the jurors, but our case law disagrees. (E.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Breaux, supra*, 1 Cal.4th at pp. 315–316.)

*2. Failure to instruct jury to determine whether death is the appropriate penalty*—Defendant argues that the court's sentencing instruction based on CALJIC No. 8.88 failed to tell the jurors that they must determine whether death is an appropriate penalty; rather, it simply called on them to weigh the various factors and decide whether death was "warranted." We rejected a similar argument on the ground that the language at issue here "clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty." (*People v. Arias* (1996) 13 Cal.4th 92, 170–171 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

*3. Failure to instruct the jury to return a verdict of life imprisonment if mitigating factors outweigh aggravating ones*—Defendant next contends that the instruction based on CALJIC No. 8.88 failed to tell the jurors they were required to impose a verdict of life imprisonment without parole if mitigating

factors outweighed aggravating ones. We have repeatedly rejected this argument. (E.g., *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 124; *People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

*4. Failure to inform jury that defendant had no burden to persuade the jurors that death was not an appropriate penalty*—Defendant claims that the instruction based on CALJIC No. 8.88 was constitutionally inadequate because it failed to instruct the jury that he had no burden to persuade them that the death penalty was inappropriate in this case. Again, we have rejected the contention. (E.g., *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 124.) Implicit in the sentencing instructions is that the determination of penalty is "essentially moral and normative [citation], and therefore . . . there is no burden of proof or burden of persuasion. [Citation.]" (*People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].)

### J. *Failure to Provide Intercase Proportionality Review*

Defendant next argues that the failure of the state's death penalty statutes to provide intercase proportionality review violates his constitutional rights to due process and equal protection. We have repeatedly rejected the claim. (E.g., *People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *People v. Panah, supra,* 35 Cal.4th at p. 499; *People v. Cox, supra,* 53 Cal.3d at p. 691; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

### K. *Asserted Violation of International Law*

Defendant next claims the state's death penalty scheme violates principles of international law, given the various "improprieties" in the capital sentencing process. As we have seen, the asserted improprieties do not exist. In any event, we have repeatedly rejected the claim that principles of international law would prohibit carrying out the death penalty in this state. (E.g., *People v. Brown, supra,* 33 Cal.4th at pp. 403–404; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1055.)

### L. *Cumulative Effect of Errors*

Defendant contends that the cumulative effect of the various asserted errors in this case warrants reversal, yet, as we have seen, no errors occurred here.

## IV. CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied July 11, 2007.