Filed 5/8/15  P. v. Matus CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B252809 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA401439) |
| PETER MATUS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Wilcox Clarke, Jr., Judge.  Affirmed.

Law Offices of Chris R. Redburn and Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Peter Matus of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found true allegations that he personally discharged a firearm causing death (§ 12022.53, subds. (d) and (e)(1)) and that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2] The trial court sentenced him to a total term of 50 years to life in state prison. He appeals from the judgment of conviction. We affirm.

# EVIDENCE

*Prosecution Evidence*

*The Banks Killing*

On the evening of April 30, 2012, defendant, a member of the Clarence gang, shot and killed Eddie Banks, a member of the rival Primera Flats gang. Earlier that afternoon, several people had gathered at the home of Angel Gonzalez, an associate of the Clarence gang, at 1928 Pennsylvania Avenue in Los Angeles. Among them were Angel,[3] Joaquin Tepetitla, Jose Cervantez (at the time a Clarence gang member), Bertha Luna (victim Banks' girlfriend), Maria Luna (Bertha's sister), Magaly Gonzalez (defendant's girlfriend), and defendant.

Bertha (Banks' girlfriend) left Angel's house with Tepetitla to buy cigarettes at Mariachi Plaza, about four blocks away. According to Bertha, on the way she

---

[1]    Undesignated section references are to the Penal Code.

[2]    The jury also found true allegations that a principal used a firearm (§ 12022.53, subds. (b) and (e)), and that a principal discharged a firearm (§ 12022.53, subds. (c) and (e)(1)). The jury acquitted defendant of one count of attempted murder (§§ 664/187, subd. (a)).

[3]    To prevent confusion, persons who share a last name with another person will be referred to by their first name.

saw Banks, but did not speak to him. She entered a store, and when she came out Tepetitla was gone. According to Tepetitla, he and Bertha encountered Banks, and without warning Banks punched him in the eye. When Tepetitla returned to the house, Angel asked what happened. Tepetitla told him that Bertha's boyfriend from Primera Flats had punched him. Magaly (defendant's girlfriend), Cervantez, and others overheard him.

Meanwhile, as Bertha walked back to Angel's house, Banks called her and they agreed to meet at Mariachi Plaza. When Bertha returned to the house, she got her backpack and told her sister Maria that she was going to meet "Thumper," Banks' nickname. When she left to meet Banks, she noticed Angel following her. She called Banks and told him, but he said not to worry. Bertha and Banks met near Bailey and First Streets, where they engaged in a loud argument that lasted a few minutes, after which they made up.

According to Cervantez,[4] Angel had left the house to find a car battery for Cervantez. When he returned, he said that someone from Primera Flats was at Mariachi Plaza. Defendant and Cervantez followed Angel to an alley near State and First Streets, opposite Bailey street.
Angel walked ahead, and waved for Cervantez and defendant to follow. Defendant put on a ski mask and hurried to the corner.[5] Cervantez, who was on a bicycle, started riding back to the house, and lost sight of defendant as he went around the corner. Cervantez then heard nine or ten gunshots.

---

[4]     After the shooting, Cervantez left the Clarence gang and cooperated with investigators. He had suffered two prior convictions of being a felon in possession of a firearm, and was on probation.

[5]     Although Cervantez testified that defendant wore a ski mask, two other witnesses, as we explain below, testified that the shooter's face was not covered in the shooting.

3

Bertha and Banks were kissing when Bertha saw someone, whom she later identified as defendant, running toward them, holding a gun. Within a few feet, defendant started shooting, aiming at Banks' chest. Banks was shot and fell to the ground. Defendant continued to approach and fire. Bertha tried to protect Banks by getting in front of him, and a bullet grazed her left index finger. Defendant fired until the gun emptied. He was within one-and-a-half feet of Bertha. She said, "I know who you are, but I didn't see your face." Defendant wore a hooded sweatshirt with the hood over his head, but she could see his face. At trial, she explained that she meant she did not know defendant, but had seen him earlier at Angel's house.[6] Defendant declared the name of his gang, "Clarence," and fled.

Jose Morales, who owned a bar near the scene of the shooting, witnessed Bertha and Banks arguing as they walked toward Mariachi Plaza. Morales saw a thin, light skinned Hispanic man approach them with his hands in his pockets, and then saw sparks and heard five to seven gunshots. The woman called for help, and Morales went inside and called 911. The shooter wore a dark jacket, dark pants, and a cap. His face was not covered, but Morales did not get a good enough look to make an identification.

Defendant caught up with Cervantez outside Angel's house. When Cervantez knocked on the door, no one answered. A neighbor, Yvette, let them inside her apartment. There, defendant told Cervantez that he had shot a guy in the face. He said the guy had a "P" tattooed on his arm and that a woman was with him. Banks' autopsy later revealed that, among other tattoos reflecting membership in Primera Flats, Banks had a "P" tattooed on the back of his upper left arm, and an "F" tattooed on the back of his upper right arm.

---

[6] We discuss Bertha's identification testimony in more detail below, in our discussion of defendant's appellate challenge to that testimony.

4

Surveillance tapes from nearby businesses were played for the jury. The tapes depicted a male riding a bicycle east in the alley toward State Street, a person running toward State Street where the shooting occurred, and a person running away from the scene of the shooting.

Magaly, who testified under a grant of immunity, was a reluctant witness, and was impeached with statements she made before trial to Los Angeles Police Officer Jorge Alfaro. Recordings of the interviews were played for the jury. In an interview on May 12, 2012, Magaly admitted being at Angel's residence before the shooting with Cervantez and Bertha, among others, but denied giving any one a ride after the shooting and denied associating with Clarence gang members. However, in a later interview on May 23, 2012, Magaly said he she lied in the May 12 interview because she had been threatened in the past by Clarence gang members for speaking to law enforcement. She now told Officer Alfaro that after leaving Angel's house with Bertha, Tepetitla returned and said that Bertha's boyfriend had punched him in the face. She said that Bertha left, after which Angel, Cervantez, and defendant also left. Angel returned and seemed panicked. He asked Magaly what happened, and repeated, "I don't know. I don't know."

The police came to the house and ordered everyone outside. While the police were there, defendant called Magaly from upstairs at Yvette's residence. He seemed panicked and asked for a ride to a motel. Magaly got her car, picked defendant up at Yvette's, and drove him to a motel.

In describing her conversation with defendant at the motel, Magaly was inconsistent as to whether defendant admitted the shooting. First, she told Officer Alfaro that defendant said that "he had just did something." Urged by Officer Alfaro to state exactly what defendant said, she replied that defendant said "I just jumped on this fool and this and that." Again urged to state exactly what

5

defendant said, Magaly replied that he said he "killed somebody, don't please don't tell nobody, don't tell nobody."

When pressed as to whether defendant said this, Magaly said, "Well, he didn't tell me, but I'm assuming he did." Officer Alfaro told Magaly not to assume anything and not to make something up. Magaly then said, "I'm not exactly [*sic*] what he told me, but I know he didn't tell me he killed somebody. He didn't, he didn't. . . . Nothing like a murder, nothing like that. I'm just saying because I guess that's what you guys want to hear, you know."
At trial, Magaly reiterated that she had told the police that appellant said he killed someone only because it was what they wanted to hear.

The autopsy showed that Banks was shot 11 times; four wounds were fatal. Nine projectiles or fragments were removed from his body.

At the scene of the killing on First Street, the police collected eleven shell casings: five were .25 caliber, six were .22 caliber. They found two semi-automatic pistols at a nearby house on the same street: a .22 caliber pistol on the porch, and a chrome .25 caliber pistol between a block wall and wooden fence. Earlier in the day before the shooting, defendant had shown Cervantez two small semi-automatic firearms he was carrying.

A ballistics analysis revealed that: (1) the five .25 caliber casings were ejected from the .25 caliber pistol, (2) four of the .22 caliber casings were ejected from the .22 caliber pistol, (3) it could not be determined whether the remaining two .22 casings were ejected from the .22 caliber pistol, (4) four of the projectiles or fragments removed from Banks' body were fired by the .25 caliber pistol, and (5) some of the projectiles could not have been fired by that pistol, but could have been fired by the .22 caliber pistol.

6

Los Angeles Police Officer Alejandro Diaz testified as the prosecution gang expert.[7] The Clarence gang had approximately 50 members, but only 10 (including defendant) were active. Pennsylvania Avenue (where Angel's residence was located) was the northern border of Clarence territory. Primera Flats had about 165 members, and was the main rival of Clarence. Banks was killed in Primera Flats territory. Presented with a hypothetical mirroring the evidence in the present case, Officer Diaz opined that Banks' killing was committed to benefit the Clarence gang.

*The Uncharged Gonzalez Robbery*

Three days before Banks' murder, defendant robbed Refugio Gonzalez outside the East Side Luv Bar. As Refugio sat in the driver's seat of his car with two other men, defendant approached the passenger side. He wore a hoodie sweater, held a small, chrome semiautomatic pistol, and repeatedly asked if Refugio and the others were from "Flats." They said they were not. Pointing his gun at Refugio and the front passenger, defendant asked for money. Refugio gave defendant his wallet, and the passenger gave what he had. Defendant fled into an alley south of and parallel to Pennsylvania Avenue, between Pennsylvania and First Street.

Shown photographs of the chrome .25 caliber pistol police recovered at the scene of the Banks' killing, Refugio testified that gun resembled the gun defendant used in the robbery. In response to a hypothetical question based on the Gonzalez robbery, Officer Diaz testified that the crime was committed to benefit the Clarence gang.

---

[7] Because defendant does not challenge the sufficiency of the evidence to support a gang allegation, we only briefly summarize the gang evidence.

*Defense Evidence*

A Los Police Department lab analysis of DNA samples from the two pistols recovered at the scene showed small amounts of DNA (too small for any definitive conclusions regarding identity) containing a mixture of DNA from two people on both weapons. This result suggested that at least two people (not necessarily the same people) had held each gun in the past (though the DNA could have been deposited days or weeks earlier), or that the victim's blood spattered onto the gun. One contributor to the DNA on the .25 caliber pistol was male; the gender of the other contributor, and of the contributors of the DNA on the .22 caliber pistol, was unknown.

Dr. Robert Shomer, an expert on eyewitness identification, testified concerning factors affecting the reliability of eyewitness identification procedures and testimony.

## DISCUSSION

*Live Lineup*

Defendant contends that the trial court erred in denying his motion to exclude evidence that Bertha identified defendant as Banks' killer at a court-ordered live lineup at Men's Central Jail on July 28, 2012. We disagree, because the undisputed evidence demonstrated that the lineup was not unduly suggestive.

"Defendant bore the burden of showing an unreliable identification procedure. [Citation.] 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the

opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.] In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*People v. Ochoa* (1998)19 Cal.4th 353, 412 (*Ochoa*).)

*The Lineup*

Los Angeles Police Detective Stephanie Carrillo obtained a court order for the live lineup. She submitted a declaration to the court which explained that defendant was a suspect in the Banks murder. She stated that Bertha Luna had told the police that when she left Angel's residence to meet Banks, "she noticed several of the males [she had earlier seen at the residence] were following her at a distance; one of the males was Angel Gonzalez. When she was walking with Banks on First Street she suddenly observed a male Hispanic, with light skin, light brown hair, hazel eyes, thin build, with tattoos on his neck run towards them from the intersection of Bailey and First Streets. Bertha recognized this male and believed it was one of the males she had just seen inside [Angel's apartment]. Bertha believed that this male was the boyfriend of a female named 'Magaly' who was also inside the residence. Bertha believed this male's name was 'Huero.' When this male approached them, he immediately started shooting Eddie numerous times from a close distance. Bertha estimated the distance to be

9

approximately one foot away. . . . The suspect then yelled out, 'Clarence' and ran away eastbound on First Street then north on State Street out of her view."

Detective Carrillo prepared a photo six-pack containing a photograph of Victor Garcia, a Clarence gang member nicknamed Huero. "Bertha pointed to the photograph in position number 5 and advised that was the person who shot her and Banks. Bertha stated that his face was similar to what she observed, but then stated that she was getting more confused by the photographs and explained that her choosing a photograph was risky."

Later, Detective Carrillo learned that defendant and Cervantez (both Clarence gang members) were present at Angel's house before the shooting. Cervantez told Detective Carrillo that defendant "was armed with two small caliber handguns that night and bragged to Cervantez that he had shot and killed a Primera Flats gang member."

Detective Carrillo then prepared a second photo six-pack which contained defendant's photo in position number 5. According to Detective Carrillo's declaration, "[o]n May 21, 2012, Detective Carrillo re-interviewed Bertha at Hollenbeck Station. I explained to her that additional individuals were being looked at in connection with the murder and I needed her to look at a new photographic lineup to identify or eliminate the possible shooter. Bertha explained that she understood and reviewed the lineup. As Bertha was reviewing the lineup, she began to cry and explained that she couldn't do it, and was not prepared to identify anyone. On June 26, 2012, Detective Carrillo met with Bertha at Hollenbeck Station. Bertha advised that during our two previous meetings, she was scared and became confused after looking at the various lineups. She stated that she could identify the suspect and would recognize him if she saw him in person."

The superior court granted the request for a lineup, which was originally scheduled for July 2, 2012, but later postponed. A second court order was obtained and the lineup was held on July 18, 2012. At the lineup, Bertha identified defendant as the shooter.

*Motion to Exclude the Identification*

Defendant filed a written motion to exclude evidence of the live lineup. He offered no evidence suggesting that the lineup procedure as conducted on July 18, 2012 was itself unduly suggestive. He conceded that his attorney was present, and that "other than noting that [defendant] was taller than the five 'fillers', did not object to the formation of the lineup."

His objection was based on defense counsel's contention that before the lineup counsel did not know that: (1) the witness attending the lineup was Bertha Luna and that she had previously selected a photograph of someone other than defendant in a photographic lineup; (2) Bertha had been shown a photographic lineup on May 21, 2012, that contained defendant's photo and had not identified him; and (3) it was not until June 26, 2012 that Bertha told detectives that she could identify the shooter in a live lineup. Further, counsel contended that the detective's declaration submitted to the court to obtain the order for a lineup was misleading. The declaration stated that Bertha gave a description of the shooter ("male Hispanic, with light skin, light brown hair, hazel eyes, . . . with tattoos on his neck") which was consistent with defendant's appearance, but the police report attached to the declaration did not contain this description. Counsel argued that "[h]ad [he] known this information, [he] would have objected as Bertha Luna had previously seen [defendant's] photograph prior to the live lineup and that [defendant] was the only person in the live lineup who was both present at the

11

Pennsylvania Avenue address [Angel's residence] on the evening of April 30, 2012, and included in the live lineup," thereby making the lineup unduly suggestive.

The prosecution submitted a written response which explained that detectives "interviewed Ms. Luna on May 21, 2012. This interview was recorded and a copy of the recording and transcript has been turned over to the defense. During their interview, Ms. Luna said that she sees the face of the shooter in her nightmares. She described him as a male Hispanic, light skin, light hair (though, she says, the hood of his sweater was up), hazel eyes, and a thin build. When the officers asked her whether the shooter had tattoos, she began to cry. The defendant has striking tattoos. Finally, she said that the shooter had tattoos like dark lines drawn vertically up his neck. This description generally fits the tattoos worn by the defendant. Finally, the officers told Ms. Luna they were going to show her a photographic lineup. Ms. Luna said she was not going to point him out. When the officers finally did show her a lineup, it contained a photograph of the defendant. Ms. Luna looked at the lineup, began to cry and said she wasn't prepared to identify anyone. She did, however, allow that she might be able to pick him out if she saw him in person.

"The detectives sought and received an order for a live lineup containing the defendant on July 11, 2012. A week later, the live lineup was conducted with five other inmates at Men's Central Jail and Ms. Luna identified the defendant as the shooter. . . . Every other member of the lineup was a light skinned Hispanic male with a shaved—or nearly shaved—head, with tattoos on his neck. Defense Counsel . . . was present for the lineup.

"As part of the live lineup procedure, the witness was admonished in a manner substantively the same as the admonition the California Supreme Court

approved of in [*People v. Virgil* (2011) 51 Cal.4th 1210, 1254-1255]. In *Virgil*, before the officer presented the photographs to the witness, he told her that she was under no obligation to identify anyone, and he did not suggest that the suspect was in the lineup."

Attached to the prosecution's response were photographs of the lineup. We have reviewed the photographs, and note that all individuals in the lineup appear to be male Hispanics of similar height with neck tattoos and shaved or short hair, and all are clad in identical jail clothing.

At the hearing on the motion to exclude Bertha's identification of defendant, the trial court denied the motion. The court observed that it appeared that defense counsel was challenging the validity of the court order for the lineup, rather than the fairness of the lineup itself. The court stated there was no precedent for attempting to traverse declarations that led to a lineup that was not suggestive: "if the only result is that someone was placed in a lineup that was otherwise fair, that doesn't seem to be subject to an exclusionary remedy."

*Bertha's Trial Testimony*

At trial, Bertha testified that during the shooting she could see the shooter's face clearly from approximately a foot and a half away. She recognized him from having seen him earlier at Angel's residence. The morning after the shooting, detectives showed her a photographic six-pack (one that did not contain defendant's photo). She selected one of the photos as depicting the shooter. However, at trial she testified that the photo did not depict the shooter. In fact, she had never seen that person before. She explained that she had falsely identified the person in the photo because she was scared that the real shooter "would come

after" her.  For the same reason, she gave a description of the shooter that was inaccurate.

A few weeks later, detectives interviewed her again and showed her another photo six-pack.  This one contained defendant's photo.  At trial, Bertha testified that she saw the shooter's photo in the six-pack, but did not pick him out because she was scared.  She also explained, however, that when asked to describe whether the shooter had any tattoos, she said that she had seen a line and gestured to each side of her neck.  Defendant has prominent lines spelling the word "East Los" tattooed across his neck, as well as tattoos on his face ("Clarence" around his mouth, "ST" under his lips, and "Sureno" above his left eyebrow).

A partial transcript of the interview was introduced at trial.  In the interview, Bertha told the detectives that she could see the shooter's face in her mind.  When shown the photographs, she said, "I have one in my mind but I'm not going to point him out yet because I just want – I'm not right now but."  Asked to picture the shooter in her head and told, "if he's here you see him, if you don't you don't," she replied, "I'm just going to say no I don't."  She explained that she was not scared but angry, and did not like the way she felt.  Asked again if she saw the shooter in the photos, she said, "I can't see. . . .  I know he—I can't do this right now."  She later added that she "want[ed] to get this over with," and "want[ed] to clear this up as soon as possible but right now, right here – right now I can't."  She stated that she was "leaving it in God's hands," and "asking him to help me. . . . And – and I can't right now."  She said, "[N]obody knows nothing to be in their shoes and then if something happens okay, nobody knows how I feel right now and I know you need my help, okay.  I know you do."  Asked "one last time" if she saw the shooter in the photographs, she replied, "No."

14

At trial Bertha testified that when she appeared at the live lineup, she identified defendant as the shooter, because she knew she "had to do the right thing." She also identified defendant as the shooter in court at the preliminary hearing and trial.

*Analysis*

"A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' [Citation.] [¶] We have held that an identification procedure is considered suggestive if it 'caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)

On appeal, defendant does not contend that the lineup as conducted was suggestive. Indeed, he cannot, because the record shows that nothing about the lineup itself made defendant stand out so as to suggest that Bertha should identify him. Rather, he contends that the lineup was unnecessary and suggestive because Bertha had already made an identification of someone else in the first photographic lineup (which did not contain defendant's photo), had denied that the shooter was depicted in the second photographic lineup (which did contain defendant's photo), and that therefore she could not provide a reliable identification of defendant at the live lineup. In support of his claim that Bertha's identification was unreliable, he relies on a host of evidence from the trial, such as Bertha's inconsistent descriptions of the shooter, her failure to mention defendant's facial tattoos, and

15

the testimony of defendant's eyewitness identification expert challenging the reliability of eyewitness identification testimony.[8]

However, as Detective Carrillo explained in her declaration in support of the court order for a lineup, after making the first photo identification, Bertha said "that she was getting more confused by the photographs and explained that her choosing a photograph was risky." Moreover, at trial, Bertha explained that she made a false identification in the first photographic lineup, and also gave a false description, because she was afraid that the real shooter would come after her. Similarly, she testified at trial that although she recognized defendant's photograph in the second photographic lineup, she did not identify him as the shooter, and in fact said that the shooter's photo did not appear in that lineup, because she was scared. The transcript of the second photo identification procedure corroborates the notion that although Bertha denied that the shooter's photograph was included, she did so not because that was the truth, but because she was hesitant to identify the shooter. The transcript reflects that she said, "I have one in my mind but I'm not going to point him out yet." She repeatedly made statements suggesting that she was not emotionally prepared to identify the shooter ("I can't do this right now," I "want to clear this up as soon as possible but right now, right here – right now I can't," "I'm leaving it in God's hands," and "asking him to help me. . . . And – and I can't right now.") She said, "[N]obody knows nothing to be in their shoes and then if something happens okay, nobody knows how I feel right now."

_____

[8] Of course, because this trial evidence was not introduced at the hearing on the motion to exclude evidence of the live lineup, it is irrelevant in judging the propriety of the trial court's ruling denying the motion. Nonetheless, in the interest of forestalling any claim of ineffective assistance of counsel in a later habeas corpus petition based on a failure to produce additional evidence at the motion, we will discuss the trial evidence in rejecting defendant's claim on the merits.

When describing her identification of defendant at the live lineup, Bertha testified at trial that she recognized defendant as the shooter and identified him because it was the right thing to do.

Under these circumstances, there is no basis to conclude that the live lineup, which was itself not suggestive, had a substantial tendency in light of prior events to produce an unreliable identification. Bertha explained her earlier inconsistencies and the transcript of the second photo identification procedure independently suggests that she recognized defendant's photograph ("I have one in my mind but I'm not going to point him out yet") but was not emotionally prepared to identify him. Moreover, to the extent defendant relies on evidence attacking the credibility of Bertha's identification testimony, including the testimony of his expert identification expert, his reliance is misplaced. "The accuracy of [the] identification was a question for the jury. Inconsistencies in . . . descriptions of the man she saw, and in her accounts of her activities on the day of the murder, are matters affecting the weight of her eyewitness testimony, not its admissibility." (*People v. Virgil, supra,* 51 Cal.4th at p. 1256.)

Because defendant has failed to show that the lineup was unduly suggestive, there is no need to discuss whether the identification of defendant was reliable under all the circumstances. (*Ochoa, supra,* 19 Cal.4th at p. 412.)

*Autopsy Photographs*

Defendant contends that the trial court erred in admitting three autopsy photographs showing Banks' wounds.[9] We disagree. First, in examining the coroner and later the prosecution gang expert, the prosecutor used two of the three

---

[9]     Although in a pretrial ruling the trial court ruled that five photos would be admissible, the prosecution used only three.

photographs to show Banks' gang tattoos – one showed "Primera Flats" tattooed on Banks' torso, and a second showed an "F" tattooed on Banks' right arm (which was paired with a "P" tattooed on his upper left arm as diagramed in the coroner's report). The tattoos were relevant to prove Banks' gang affiliation and defendant's gang-related motive for the murder. Moreover, Banks' arm tattoos – "PF" for Primera Flats – were particularly relevant because Cervantes testified that after the shooting, defendant told him that he had shot a guy who had a "P" tattooed on his arm.

Second, although the three photographs depicted fatal gunshot wounds, surgical incisions, and trajectory rods, they were not were particularly inflammatory, and were relevant in establishing the cause of death and to corroborate Bertha's testimony concerning how the killing occurred – multiple gunshots fired at Banks' upper body.

Third, before the photos were displayed to the jury during the coroner's testimony, the court admonished the jury: "These are photographs . . . of a deceased person and something you probably don't encounter regularly in your life. And whether or not they are difficult for you to look at, I can't predict, but I've asked counsel to display them only for a brief time and, . . . in advance [he] or his witness . . . will tell you what . . . any given particular picture [is] trying to illustrate best by showing the picture." Thereafter, the jury only briefly viewed the photographs and the prosecutor isolated tattoos or wounds that he questioned the coroner briefly about.

Under these circumstances, the probative value of the three photographs was not substantially outweighed by their potential prejudice (Evid. Code, § 352), and the trial court did not abuse its discretion in admitting them. "'The admissibility of victim and crime scene photographs . . . is governed by the same rules of evidence

18

used to determine the admissibility of evidence generally: Only relevant evidence is admissible. [Citations.] The trial court has broad discretion in deciding the relevancy of such evidence. [Citations.]' [Citation.] In a prosecution for murder, photographs of the murder victim . . . are always relevant to prove how the charged crime occurred, and the prosecution is 'not obliged to prove these details solely from the testimony of live witnesses.' [Citation.]" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1170.)

*Evidence of the Uncharged Gonzalez Robbery*

Defendant contends that the trial court erred in admitting evidence of the uncharged Gonzalez robbery. We disagree. Three days before the murder, defendant robbed Gonzalez using a chrome handgun resembling one of the pistols used to kill Banks, and used a gang challenge in committing the crime, demanding to know if Gonzalez and his companions were from the Flats (referring to Banks' gang, Primera Flats). This evidence was highly relevant to prove defendant's motive to kill Banks (antipathy toward Primera Flats gang members) and his intent to benefit his gang, Clarence, as relevant to the gang allegation (he used gang challenges in both crimes, separated in time by only three days). Both of these purposes are legitimate uses for prior crimes evidence under Evidence Code section 1101, subdivision (b). (See *People v. Lewis* (2001) 25 Cal.4th 610, 637 [on the issue of intent, uncharged crimes need only be sufficiently similar to the charged crime to infer that defendant probably had the same intent in both crimes].)

Defendant argues that the evidence of the prior robbery was extremely prejudicial because "a prior robbery with gang overtones is highly inflammatory in a murder trial." However, the jury was instructed that it could consider the

19

evidence only on the issues of motive and whether defendant intended to benefit a criminal street gang in the Banks killing. Moreover, the robbery was considerably less inflammatory than the murder, and in argument, the prosecutor mentioned the Gonzalez robbery only once. In arguing that defendant was guilty of first degree murder, the prosecutor argued in part: "We know that he [defendant] personally hates Primera Flats . . . because we heard the testimony of Refugio Gonzalez. He was the guy that was in the car three days before this murder . . . after leaving Eastside Luv Bar. He told us . . . defendant approached on the passenger side, leaned in with a small chrome handgun said, 'Are you guys from Flats?'" Finally, the murder was suffused with gang overtones even without evidence of the Gonzalez robbery.

Defendant contends that the jury might have considered the Gonzalez robbery on the issue of identity, despite the court's limiting instruction. Without deciding whether, as argued by respondent, the evidence was independently admissible on the issue of identity, we presume that the jury followed the court's instruction. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) In short, the trial court did not abuse its discretion in admitting evidence of the Gonzalez robbery. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

*Gang Allegation*

Defendant contends that the trial court erred in denying his motion to bifurcate the gang allegation. We find no abuse of discretion.

Bifurcation of a gang enhancement may be warranted where the gang evidence is "so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) But, "[t]o the

20

extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id*. at pp. 1049-1050.) "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself . . . a court may still deny bifurcation." (*Id*. at p. 1050.)

The denial of a motion to bifurcate the trial of a gang enhancement is reviewed for an abuse of discretion. (*Hernandez, supra,* 33 Cal.4th at p. 1048.) The "trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Id*. at p. 1050.) There is no abuse of discretion if the gang evidence is relevant to the charged offense or is not so minimally probative and so inflammatory in comparison that "it threatened to sway the jury to convict regardless of defendant['s] actual guilt." (*Id*. at p. 1051.) To show an abuse of discretion, defendants have the burden "'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Ibid*.)

Here, the evidence is undisputed that Banks' murder was gang related. Defendant declared as much when, after gunning Banks down (shooting him 11 times), he announced his gang affiliation ("Clarence"). Evidence of defendant's gang membership, the rivalry between his gang (Clarence) and Banks' gang (Primera Flats), and the evidence (expert and otherwise) of defendant's intent to benefit his gang by killing Banks could not be divorced from the murder itself and was independently admissible. The gang evidence (including the commission of predicate crimes by other gang members in support of the gang allegation) was not more prejudicial than the evidence surrounding the murder itself. Indeed, given the wealth of otherwise admissible gang evidence, this is the quintessential case in

21

which a trial court properly denies a motion to bifurcate a gang allegation.  Hence, we find no abuse of discretion in denying the motion to bifurcate the gang allegation.


## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P.J.


We concur:


MANELLA, J.


COLLINS, J.


22