Filed 10/8/21  P. v. Farraj CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088072 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE007880) |
| v. | OPINION ON TRANSFER |
| TAHER GHAZI FARRAJ, | |
| Defendant and Appellant. | |

A man approximately six feet tall with a light complexion and dark beard was captured on surveillance video committing three separate armed robberies at the same convenience store within a 10-day period in April of 2017.  Acting on a tip from a confidential informant, police searched defendant Taher Ghazi Farraj's residence and vehicles.  The police found clothing consistent with what the suspect wore during the robberies and a loaded silver .22-caliber revolver matching the description of the handgun used by the suspect.  The store clerks were unable to positively identify defendant in photographic lineups (or at trial), but one of the two clerks who was robbed positively identified defendant in a live pretrial lineup.

1

After a jury trial, defendant was convicted of three counts of robbery in the second degree (Pen. Code, § 211).[1]  The jury also found that defendant personally used a firearm (§ 12022.53, subd. (b)) and, for one of the counts, that he personally discharged a firearm.  (§ 12022.53, subd. (c).)  Defendant pleaded no contest to unlawful possession of a firearm and ammunition.  (§§ 29800, subd. (a)(1), 30305, subd. (a)(1).)  The trial court declined to strike the firearm enhancements, and sentenced defendant to 31 years eight months in prison.

On appeal, defendant argues (1) we should independently review whether the trial court properly denied his motion to disclose the identity of the confidential informant; (2) his trial counsel provided ineffective assistance by failing to object to an unduly suggestive live lineup; and (3) the trial court violated defendant's rights to due process and a fair trial by instructing the jury pursuant to CALCRIM No. 315 that a witness's level of certainty is a factor to consider in evaluating the reliability of eyewitness identification testimony.

In our prior unpublished opinion, we affirmed the trial court's judgment.  The California Supreme Court granted review and ordered briefing deferred pending its decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), which presented the following issue:  "Does instructing a jury with CALCRIM No. 315 that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification violate a defendant's due process rights . . . ?"

In May 2021, the Supreme Court issued its decision in *Lemcke, supra*, 11 Cal.5th 644.  The court then transferred this matter back to us with directions to vacate our decision and reconsider the cause in light of *Lemcke*.  Having reexamined the record, we conclude *Lemcke* does not change the result and reissue our prior opinion affirming the judgment, with modest revisions.

---

[1]    Further undesignated statutory references are to the Penal Code.

BACKGROUND FACTS AND PROCEDURE

*The first robbery (count one)*

On April 15, 2017, S.S. was working as a cashier at an AM/PM convenience store. S.S. testified that a man came in the store that night and asked for change. The man was wearing a gray hooded jacket, dark jeans, a hat, and glasses. As S.S. opened the register, the man showed S.S. a gun and demanded money. When S.S. resisted, the man got upset and fired the gun at the ceiling. The man then reached into the register, removed the money, and left.

S.S. called the police. S.S. described the robber to the police as a White adult male in his 30's, at least six feet tall, with a medium build, brown eyes, and a light brown beard. S.S. said the robber was carrying a silver handgun. The responding officer located a hole in the ceiling near the register. Another officer later recovered a .22-caliber bullet from the ceiling.

*The second robbery (count two)*

On April 18, 2017, three days after the first incident, S.S. again was working at the convenience store when a second robbery occurred. Although the suspect was not wearing glasses and the suspect's facial hair appeared somewhat different, S.S. told police it was "the same suspect who had robbed the business a few days prior," using the same gun. S.S. described the suspect as a White male, six feet tall, 170 pounds, in his 30's, with a black beard, and wearing a red sweatshirt and dark pants.[2] Although S.S. had described the suspect as White, after watching surveillance footage of the robbery, the responding officer determined the suspect was "possibly Middle Eastern."

At trial, S.S. could not positively identify defendant as the man who robbed the store.

---

[2]    S.S. eventually came to believe the robber was Persian or Iranian because the robber had a slight Persian accent, and S.S. told his wife so.

3

*The third robbery (count three)*

On April 24, 2017, M.S. was working as a cashier at the same convenience store when a third robbery occurred. M.S. testified the robber was about six feet tall, had a beard, was wearing a gray sweatshirt and gloves, and used a silver gun. At trial, M.S. was unable to identify defendant as the robber, stating, "I didn't see him that much."

*The search of defendant's home*

On April 29, 2017, the police released video stills of the robberies to the media. That same day police received a tip from a confidential informant identifying defendant as the robber. This fact was not presented to the jury.

Based on the informant's tip, the police searched defendant's home, which was about four and a half miles from the AM/PM store. At the time, defendant was on searchable probation.

During their search, police collected a man's plain gray hoodie, a man's red hoodie, a pair of black trousers, defendant's glasses, and a box of live 12-gauge shotgun shells. In the center console of a vehicle outside the residence, police found a brown leather wallet with defendant's photo identification in it and, beneath the wallet, a loaded silver-colored .22-caliber revolver.[3] Police also found a black baseball cap in the vehicle.

The clothing collected from defendant's home and vehicle was consistent with what the robber in the store security videos wore. Police were unable to definitively conclude that the revolver found in defendant's vehicle fired the bullet recovered from

---

[3] Police searched two vehicles. One was parked in the garage and the other (an Acura) was parked in front of the house on the street. The gun and defendant's wallet were found in the Acura. When officers first asked defendant about the Acura, he claimed he did not know whose vehicle it was. When officers began to search the Acura, defendant's demeanor changed; he became "very irate and started yelling and cursing" at officers that they could not search the vehicle.

the store ceiling, but the class characteristics (caliber and rifling) were determined to be consistent.

*The lineups*

After defendant was arrested, police conducted photographic lineups with the victims of the robberies (M.S. and S.S.). After admonishing the victims, a detective separately showed M.S. and S.S. a series of six photographs, consisting of a photograph of defendant, along with five other individuals determined to be similar in appearance ("stand-ins").[4] M.S. immediately identified one of the stand-ins as the robber. S.S. wavered between defendant and one of the stand-ins before tentatively identifying one of the stand-ins.

On May 10, 2017, police conducted a live lineup with S.S. Detectives showed S.S. a lineup consisting of defendant and four stand-ins who were selected from a pool of inmates at the jail. When selecting the stand-ins, the police looked for individuals who were similar in appearance to defendant.[5] The individuals involved in the lineup were arranged in a random order and all wore the same clothing. A photograph of the lineup was admitted into evidence.

The police admonished S.S. that he was under no obligation to select anyone from the lineup and that the person who committed the crime might not be in the lineup. After about 20 seconds of looking at the lineup, S.S. selected defendant based on his height, beard, and physical appearance. S.S. checked the box indicating he was "sure" about the identification.

---

[4] The photograph of defendant was approximately seven months old.

[5] Where relevant, we refer to additional facts in the discussion below.

*Defense case*

Defendant did not testify and did not present any defense evidence. The defense theory of the case was that the live lineup was unduly prejudicial and that the defendant had been misidentified as the robber.

*The jury's verdict and sentencing*

A jury found defendant guilty of three counts of robbery in the second degree (§ 211). For counts one, two, and three, the jury found true that defendant personally used a firearm (§ 12022.53, subd. (b)), and for count one that defendant personally discharged a firearm (§ 12022.53, subd. (c)). Defendant entered pleas of nolo contendere to counts four and five, unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)), and unlawful possession of ammunition by a felon (§ 30305, subd. (a)(1)).

The trial court declined to strike the firearm enhancements, and sentenced defendant to 31 years eight months in prison, comprised of (1) a three-year principal term for count one (midterm), plus a 20-year enhancement under section 12022.53, subdivision (c) for discharging a firearm; (2) a consecutive term of one year (one-third the midterm) for count two, enhanced by three years, four months under section 12022.53, subdivision (b) for using a firearm; (3) a consecutive term of one year (one-third the midterm) for count three, enhanced by three years, four months under section 12022.53, subdivision (b) for using a firearm; (4) a three-year concurrent term for count four (upper term), stayed under section 654; and (5) a two-year concurrent term for count five (midterm).

DISCUSSION

I

*Disclosure of the Confidential Informant's Identity*

Prior to trial, defendant moved for disclosure of the identity of the confidential informant who tipped the police that defendant committed the robberies. The People opposed the motion, relying on the government's privilege to withhold the identity of a

6

confidential informant under Evidence Code section 1041. After an in camera hearing, the trial court denied the motion.

On appeal, defendant asks us to independently review the sealed transcript of the in camera hearing to determine whether the trial court properly denied his motion. The People have no opposition to an independent review.

We review the trial court's ruling for abuse of discretion. (*People v. Bradley* (2017) 7 Cal.App.5th 607, 621 (*Bradley*).) Based on our independent review of the record, including the sealed transcript of the in camera hearing, we find no abuse of discretion.

Evidence Code section 1041 grants the government a privilege not to disclose the identity of a confidential informant when "the necessity for preserving the confidentiality of [the informer's] identity outweighs the necessity for disclosure in the interest of justice." (Evid. Code, § 1041, subd. (a)(2).) Under Evidence Code section 1041, the state's interest in preserving confidentiality must be balanced against the defendant's right to due process and a fair trial. (*People v. Lee* (1985) 164 Cal.App.3d 830, 835.) That balance hinges on whether the informant is a potential material witness on the issue of guilt. (*Bradley, supra*, 7 Cal.App.5th at p. 626; *People v. Hobbs* (1994) 7 Cal.4th 948, 959.)

The test for determining whether an informant is a material witness is whether the informant has " 'knowledge of facts that would tend to exculpate the defendant.' " (*Bradley, supra*, 7 Cal.App.5th at p. 622.) A trial court does not abuse its discretion in denying a motion to disclose the identity of a confidential informant where " 'the record demonstrates, based on a sufficiently searching inquiry, that the informant could not have provided any evidence that, to a reasonable possibility, might have exonerated defendant.' " (*Id.* at p. 620; *People v. Lawley* (2002) 27 Cal.4th 102, 160.)

The confidential informant here was not a participant in the crimes, was not a percipient witness, and was not present when the crimes occurred. He or she was a mere

7

informant, who simply pointed the finger of suspicion toward a person who might have violated the law after the video stills were released by law enforcement to the media. Disclosure of the informant's identity would not have been relevant or helpful to the defense and was not essential to a fair trial. Had the confidential informant testified at trial, that testimony merely would have reinforced the evidence of defendant's guilt. We see no indication from our review of the sealed transcript that suggests the informant could have provided any evidence that, to a reasonable possibility, might have exonerated defendant. Accordingly, the trial court did not abuse its discretion in denying defendant's motion.

## II

### *Ineffective Assistance of Counsel*

At trial, the prosecution introduced evidence that S.S. positively identified defendant at a live lineup. Although defense counsel argued to the jury that the lineup was impermissibly suggestive, defense counsel did not object to or move to suppress the live lineup evidence. On appeal, defendant argues that defense counsel's failure to move to object to the introduction of such evidence denied him effective assistance of counsel. We disagree.

To prevail on an ineffective assistance of counsel claim, it is the defendant's burden to prove (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692, 694 [80 L.Ed.2d 674, 693, 696, 698]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

" 'Surmounting *Strickland*'s high bar is never an easy task.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642].) In measuring counsel's performance, judicial review is highly deferential. (*Strickland v. Washington, supra*, 466 U.S. at p. 689.) "We presume that counsel rendered adequate assistance and

exercised reasonable professional judgment in making significant trial decisions. [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 703.) When a claim of ineffective assistance is made on appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could have been " ' "no conceivable tactical purpose" ' for counsel's actions." (*People v. Earp* (1999) 20 Cal.4th 826, 896; *People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Here, defendant argues there is no satisfactory explanation for defense counsel's failure to object because the identification was the product of an unduly suggestive lineup. Defendant's argument presumes the trial court would have been obliged to grant any objection or motion to suppress. Because we do not find the live lineup to be unduly suggestive, we disagree counsel fell below a standard of reasonable competence by failing to object.

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ."[6] (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) A due process violation occurs only if the identification procedure is " 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355 (*Cook*), quoting *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].)

---

**6**     Only if a challenged procedure is unduly suggestive is it necessary to reach the issue of whether the identification nevertheless was reliable under the totality of the circumstances. (*People v. Alexander* (2010) 49 Cal.4th 846, 902; *People v. Ochoa* (1998) 19 Cal.4th 353, 412.)

9

When determining whether the identification was unduly suggestive, the question is whether anything caused defendant to stand out from the others in a way that would suggest the witness should select him. (*Cook, supra*, 40 Cal.4th at p. 1355.) It is a defendant's burden to show that an identification procedure was unduly suggestive. (*Ibid.*) This burden requires showing unfairness as a "demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

In this case, defendant does not argue that any conduct by police during the lineup was impermissibly suggestive. Rather, he argues the makeup of the lineup itself was impermissibly suggestive due to differences in the height and perceived race/ethnicity of defendant and other participants.[7] We do not find this argument persuasive.

First, the officer who conducted the lineup testified that shorter individuals typically are placed on blocks, hidden behind a drape, to give the appearance of a uniform height, and that the usual lineup procedures were followed in this case. The officer testified that the two shorter individuals in positions two and five likely would have been standing on blocks. The photograph of the lineup, admitted into evidence, appears to show the two shorter individuals standing on blocks. Because the top of the blocks are visible in the photo, defendant argues the blocks did not neutralize the differences in height. However, the officer testified that photographs typically are taken after the witness is gone, so the draping that is a foot or two in front of the individuals "would have been there" during the lineup.

---

[7] Defendant argues that he was denied the assistance of counsel at the live lineup in violation of his Sixth Amendment rights. However, this argument is not included under a separate heading nor supported by citations to the record or reasoned legal argument. Accordingly, we need not consider it. In any event, the argument lacks merit. (*Cook, supra*, 40 Cal.4th at pp. 1353-1354 [defendant does not have right to have evidence of a preaccusatory lineup excluded merely because counsel was not present at lineup].)

10

Furthermore, there is nothing to indicate that defendant's height alone caused him to stand out relative to the other participants in the lineup. Defendant is approximately six feet tall. Two of the stand-ins used in the lineup were approximately the same height. The other two stand-ins were somewhat shorter—one was five feet seven inches tall, and the other five feet eight inches tall—but even if the blocks were not concealed by drapery, these differences in height were not enough to render the lineup impermissibly suggestive. "Because human beings do not look exactly alike, differences are inevitable." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, superseded on other grounds as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.) "[T]here is no requirement that a defendant in a lineup . . . be surrounded by others nearly identical in appearance." (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052; see also *People v. Johnson* (1992) 3 Cal.4th 1183, 1217 (*Johnson*).) Courts have upheld lineups with similar disparities among the participants. (*People v. DeSantis, supra*, 2 Cal.4th at p. 1223 [three-inch height disparity between participants]; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 790, fn. 12 [four-inch height disparity]; *People v. Burke* (1980) 102 Cal.App.3d 932, 941, fn. 4 [two-inch height disparity]; see also *People v. Faulkner* (1972) 28 Cal.App.3d 384, 391 [while a "lineup with a tall defendant among short men could be unfair [citation], . . . the height disparity in a lineup is not per se suggestive"], disapproved on other grounds as stated in *People v. Bustamante* (1981) 30 Cal.3d 88, 102.)

Equally unpersuasive is defendant's argument that the lineup was unduly suggestive because defendant was "one of only two unequivocally Middle Eastern men in the lineup." First, this argument is not supported by the record. The race/ethnicity of the participants in the lineup was never established. On cross-examination, the officer who

performed the lineup merely gave her best guess about the race/ethnicity of the participants based on a photograph of the lineup.**8**

Second, even if defendant were one of only two Middle Eastern men in the lineup, this does not prove the lineup was unduly suggestive. As the officer who performed the lineup testified, and is apparent from the exhibit itself, persons may look similar even if they are not the same race/ethnicity. (*People v. Clark* (2016) 63 Cal.4th 522, 557 ["apparent racial or ethnic identity is something that is harder to quantify and agree on, so opinions in this area can vary"].) And defendant ignores that in preparing the lineup, police were faced with trying to match several different physical characteristics, including defendant's height, complexion (skin tone), and facial hair. "Police stations are not theatrical casting offices; a reasonable effort to harmonize the lineup is normally all that is required. [Citation.]" (*United States v. Lewis* (8th Cir. 1976) 547 F.2d 1030, 1035.)

As discussed above, the test is whether anything caused the defendant to stand out from the others in a way that would suggest the witness should select him. (*Cook, supra*, 40 Cal.4th at p. 1355.) Although defendant does not discuss the similarities in appearance between defendant and the stand-ins, we note that all the individuals appear to be similar in age, weight, build, and complexion, and to have similar hair and facial hair. All the participants are wearing the same clothing. No one stands out. Having reviewed the evidence in the record, including the photograph of the participants in the lineup, we are not persuaded that any differences in height and/or perceived race/ethnicity caused defendant to stand out.

---

**8** The officer testified that one of the stand-ins appeared to be Middle Eastern, one was "[p]ossibly Hispanic," one appeared to be "some type of Middle Eastern descent" or "[m]aybe African[-]American," and the other, she believed, was African-American. The officer was unsure of defendant's race/ethnicity.

Because defendant has failed to show the identification procedure was unduly suggestive, defendant's ineffective assistance claim fails. "Trial counsel is not required to make futile objections, advance meritless arguments, or undertake useless procedural challenges merely to create a record . . . . [Citation.]" (*People v. Jones* (1979) 96 Cal.App.3d 820, 827; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1080; *People v. Anderson, supra*, 25 Cal.4th at p. 587.) Counsel's approach to the issue, arguing to the jury that the lineup was suggestive and that defendant was misidentified, was within professional standards of competency.

## III

### *CALCRIM No. 315*

At trial, the court instructed the jury with CALCRIM No. 315, the standard instruction regarding eyewitness identifications. CALCRIM No. 315 instructs the jury to consider various questions in deciding whether an eyewitness "gave truthful and accurate testimony," including, "How certain was the witness when he or she made an identification?"

On appeal, defendant argues the trial court erred by instructing the jury that a witness's level of certainty is a factor to consider in evaluating the reliability of identification testimony. Defendant argues that a growing body of research shows that certainty is not necessarily correlated with accuracy. Defendant argues that allowing eyewitness certainty to be considered violated his rights to due process and a fair trial.

The People contend defendant forfeited his claim because he did not object to the instruction or request any modification to the instruction at trial. Because defendant did not request any modification or clarification of CALCRIM No. 315, we agree that defendant has forfeited that contention on appeal. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*); *People v. Dennis* (1998) 17 Cal.4th 468, 514.) We nevertheless exercise our discretion to address defendant's due process challenge to the standard CALCRIM No. 315 instruction because it involves an important issue of constitutional

13

law and because an objection would have been futile under existing law. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887-888, fn. 7; *People v. Welch* (1993) 5 Cal.4th 228, 237.) Regardless, we conclude there was no error.

At the time of trial in this case, the California Supreme Court had upheld the inclusion of the certainty language in the standard instruction at least twice. (*Sánchez, supra*, 63 Cal.4th 411; *Johnson, supra*, 3 Cal.4th 1183.) In *Johnson*, the court considered a challenge to CALJIC No. 2.92, the precursor to CALCRIM No. 315, which instructed jurors to consider any factor that bears on the accuracy of the witness's identification, including "[t]he extent to which the witness was either certain or uncertain of the identification." (*Johnson*, at p. 1230, fn. 12.) The defendant in *Johnson* argued that the trial court erred in permitting the jury to consider the certainty of a witness's identification because an expert had testified, without contradiction, that "confidence in an identification does not positively correlate with its accuracy." (*Id*. at p. 1231.) The Supreme Court disagreed, finding no error. (*Id*. at p. 1232; see also *People v. Wright* (1988) 45 Cal.3d 1126, 1138-1144 [upholding CALJIC No. 2.92].)

In *Sánchez*, another case involving CALJIC No. 2.92, the jury had been instructed to consider a witness's certainty in making an identification. (*Sánchez, supra*, 63 Cal.4th at p. 461.) On appeal, citing scientific studies concluding there is a "weak correlation" between witness certainty and accuracy, the defendant argued that the court erred by permitting the jury to consider witness certainty when evaluating the reliability of an identification. (*Ibid*.) The Supreme Court concluded that the defendant forfeited the claim by failing to request modification of the instruction. (*Id*. at p. 461.) But the court nevertheless proceeded to the merits, concluding that it was not error for the trial court to give the instruction and that defendant suffered no prejudice from it. (*Id*. at p. 462.) The court noted that studies suggesting a weak correlation between witness certainty and accuracy were "nothing new." (*Ibid*.) Despite such studies, the court had "specifically

14

approved CALJIC No. 2.92, including its certainty factor." (*Sánchez,* at p. 462.) The court declined to reconsider the propriety of its previous holdings. (*Ibid.*)

Given this precedent, we concluded in our prior opinion that instructing the jury with the standard CALCRIM No. 315 instruction did not violate defendant's due process rights. The California Supreme Court subsequently granted review and later transferred this matter back to us with directions to reconsider the cause in light of its decision in *Lemcke, supra*, 11 Cal.5th 644, which involved a similar challenge to CALCRIM No. 315. The People filed a supplemental brief addressing the impact of *Lemcke* on our prior opinion; defendant did not.

We conclude that *Lemcke* does not change our prior decision. In *Lemcke, supra*, 11 Cal.5th 644, the Supreme Court affirmed its previous holdings in *Johnson* and *Sánchez,* concluding that CALCRIM No. 315's certainty instruction did not violate the defendant's due process rights. (*Lemcke*, at pp. 646-647, 654-661.) The defendant in *Lemcke* was convicted of assault and robbery based primarily on the testimony of the victim, who identified the defendant at trial and in a photographic lineup. (*Id.* at pp. 646, 648-650, 666.) The sole issue on appeal was whether defendant's due process rights were violated when the court provided a jury instruction modeled on CALCRIM No. 315 listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating the eyewitness testimony. (*Lemcke*, at pp. 646-647, 654.)

The defendant in *Lemcke* argued that "instructing the jury to consider an eyewitness's level of certainty, without clarifying the limited correlation between certainty and accuracy, violates due process" by lowering the prosecution's burden of proof and by denying the defendant a meaningful opportunity to present a complete defense. (*Lemcke, supra*, 11 Cal.5th at p. 657.) The Supreme Court disagreed. (*Id.* at pp. 657-661.) When considered in the context of the other instructions and the whole trial record, the court found nothing in the language of the instruction operated to lower

the prosecution's burden of proof or violated due process. (*Id*. at pp. 657, 659, 661.) We reach the same conclusion here.

As in *Lemcke*, the instruction at issue here did not direct the jury that " 'certainty equals accuracy,' " or "state that the jury must presume an identification is accurate if the eyewitness has expressed certainty." (*Lemcke, supra*, 11 Cal.5th at p. 657.) It merely listed the witness's level of certainty as one of 15 factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. In addition, the instruction explicitly reminded the jury that the prosecution has the burden of proving its case beyond a reasonable doubt.

Further, it is well established that a challenged instruction may not be judged in isolation, but must be considered in the context of the instructions as a whole and the trial record. (*People v. Foster* (2010) 50 Cal.4th 1301, 1335.) Here, as in *Lemcke*, the jury received a general instruction on witness testimony, explaining that it was up to them to judge the credibility and believability of the witnesses and to decide whether they believed all or part of the testimony of each witness. (*Lemcke, supra*, 11 Cal.5th at p. 658.) The instruction advised jurors that "[p]eople sometimes honestly forget things or make mistakes about what they remember." The trial court also instructed the jury on how to evaluate lay witness opinion testimony, considering the "extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion." And the trial court expressly directed the jury that defendant was presumed innocent and that the prosecution had the burden of proving all elements of the crime beyond a reasonable doubt. (*Lemcke*, at p. 658.)

Although the defendant in *Lemcke* presented testimony from an eyewitness identifications expert, and defendant here did not, we do not find this distinction material under the circumstances of this case. In *Lemcke*, the conviction was "based almost entirely on the testimony of a single witness who expressed certainty in her

16

identification" of the defendant.  (*Lemcke, supra*, 11 Cal.5th at p. 666.)  By contrast, in this case, both witnesses who testified at trial failed to identify defendant in photographic lineups and were unable to identify defendant at trial.  As defense counsel argued in closing, there were five attempted identifications, and four times the witnesses failed to identify the defendant.  Likewise, the prosecution conceded during closing that it "clearly . . . wouldn't be able to base a case just on [the] witnesses' identifications, and that's not what we are trying to do."

Here, the potentially misleading effects of the certainty instruction were eliminated—or at least greatly diminished—by the uncertainty surrounding the witness identifications.  (*Lemcke, supra*, 11 Cal.5th at p. 669, fn. 19.)  Under such circumstances, the challenged instruction was as likely to benefit defendant as to prejudice him.  (See *Sánchez, supra*, 63 Cal.4th at p. 462.)

Viewing the instructions as a whole, in light of the record at trial, we conclude it is not reasonably likely the jury understood the challenged certainty instruction as lowering the prosecution's burden of proof.  Thus, after reexamining the record, we reach the same conclusion that we did in our prior opinion:  there was no error in the trial court's instruction.

### DISPOSITION

The judgment is affirmed.

       KRAUSE       , J.

We concur:

     ROBIE      , Acting P. J.

     DUARTE     , J.